# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4577-15T2

NEW JERSEY DIVISION
OF CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

A.S.K., and T.T.,

    Defendants,

and

E.M.C.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF N.D.K., A.E.C., and E.S.K.,
minors.

_____

> **APPROVED FOR PUBLICATION**
>
> **January 23, 2019**
>
> **APPELLATE DIVISION**

Submitted February 7, 2017 — Decided  May 23, 2017

Before Judges Espinosa, Suter and Guadagno
(Judge Guadagno dissenting).

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Essex County,
Docket No. FG-07-0197-15.

Joseph E. Krakora, Public Defender, attorney
for appellant (Kourtney J.A. Knop, Designated
Counsel, on the briefs).

Christopher S. Porrino, Attorney General,
attorney for respondent (Andrea M. Silkowitz,

Assistant Attorney General, of counsel; Paul H. Juzdan, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor A.E.C. (Tracye Wilson Elliot, Designated Counsel, on the brief).

PER CURIAM

This guardianship matter initially concerned three children born to defendant A.K. (Ali).[1]  Defendant E.M.C. (Eric) is the father of one of those children, A.E.C. (Adam), and appeals from an order that terminated his parental rights to his son.  We affirm.

Ali's parental rights to all three of her children were also terminated.  Because she has not appealed, our review of the facts focuses on Eric and his relationship with Adam.

I.

Adam was born on November 14, 2009.  Although Eric reported that his relationship with Ali ended approximately seven months earlier, he is listed as the father on Adam's birth certificate.

Adam began residing with Eric in March 2012 after Ali contacted him through Facebook.  The other residents of the three bedroom apartment were: Eric's fiancée, N.R. (Nell), his

---

[1]  We use initials and pseudonyms to protect the privacy of the parties and minor child.

2                                                        A-4577-15T2

biological child with Nell, M.C., (born August 14, 2011), Nell's two children and Eric's sister. Before Adam came to live with him, Eric had last seen his son in July 2011. He told the caseworker he had been unable to see him more frequently because he was working on construction jobs out of town.

The first referral to the Division of Child Protection and Permanency (the Division) was made in April 2012, after Eric brought twenty-nine month-old Adam to the pediatrician with severe eczema. Adam was undernourished, weighing twenty-one pounds, the weight of a child half his age. His speech was mumbled. Eric learned from the pediatrician that Adam had not been to the doctor in over two years and was behind in his immunizations. Eric stated his earlier attempt to take Adam to the doctor had been thwarted because Ali failed to provide him with the child's "medical card."

Eric cooperated with the Division's investigation, allowing access to his home, providing his birth date, phone number, and social security number as well as contact information for Eric's mother and grandmother. Eric advised the caseworker he had filed for legal and residential custody of Adam in March 2012 and was told that, because he was in arrears on his child support obligation, he needed to provide confirmation he had employment that would permit him to reduce his arrears. The Division provided a bed for Adam, who was then sleeping in a bed with two other

children.  The April 2012 investigation summary reported Eric "followed-up with all the child's medical appointments" and Adam was "now up to date with his immunizations and . . . receiving treatment for his eczema."  Because Adam was residing with Eric, the allegation of abuse and neglect against Ali was deemed unsubstantiated.

In September 2012, a second referral to the Division was made by an anonymous neighbor of Ali's, reporting drug use by Ali, her sister and mother while children were in their care.  The reporter stated she observed Ali smoking marijuana along with her mother; that Ali's four-year-old child, N.K. (Nick), was "always" outside, unsupervised, and ate dry, uncooked noodles.  The harm alleged was substantial risk of physical injury and inadequate supervision.  The investigation confirmed Adam continued to reside with Eric at this time and, although child welfare concerns persisted regarding Ali's admitted drug use, the allegations of neglect and inadequate supervision were deemed to be unfounded.

Ali gave birth to a third child, E.S.K. (Eddie), on June 24, 2013, and alleged Eric was the biological father.  Nell was displeased that Eric had another child with Ali and, by July 2013, Adam returned to live with Ali.

In December 2013, the Division filed for and was granted care and supervision of all three of Ali's children (the FN litigation).

4

On April 9, 2014, the Division executed an emergency removal of the three children from Ali's residence pursuant to N.J.S.A. 9:6-8.29 and -8.30. Initially, the children were placed with Ali's cousin, S.K. However, in August 2014, S.K. advised the Division that she wanted all three children removed. The children were then placed with M.L. (Maisie), a resource identified by Ali. The Division was unable to contact Eric for other suggested resources because his whereabouts were unknown.

In May and June 2014, the Division embarked upon an extensive search to locate Eric. The search ended, by coincidence, on June 18, 2014, during an unannounced home visit to Ali. Eric emerged from her residence as Ali was speaking with the caseworker. The caseworker exchanged contact information with Eric. She also advised him a Family Team Meeting was scheduled for June 23 at the Division's Newark office and it was important for him to attend. The caseworker contacted Eric on the day of the meeting to confirm he would attend. He stated he would not attend because his grandmother was hospitalized with an unknown illness.[2] The caseworker stressed the importance of his attendance and stated if he could not attend, he needed to remain in contact with her so the Division could discuss the permanency plan for his children.

---

[2] No documentation was ever provided to corroborate this statement.

Thereafter, the Division was unable to contact Eric because his telephone number was shut off. As of January 2015, Eric had not contacted the caseworker.

The Division's goal changed from reunification for the three children to adoption in January 2015 and a guardianship complaint was filed in February 2015.

Thereafter, the Division was again unable to locate Eric for an extended period of time. Rosalyn Moulton, the Primary Worker for the Division on this matter, testified she was in the process of checking addresses for him in January 2016 when his grandmother provided an address for him in East Orange. While she was on her way there, she received a call from Eric, who had been called by his grandmother, and was then able to meet with him.

Eric's first appearance in the guardianship litigation was on January 14, 2016, approximately eleven months after it had been initiated. Although he had paid child support for Adam without challenging paternity, Eric requested a paternity test.[3] Eric's attorney represented that, pending the results of the paternity test, Eric "would like to be a placement. He's willing to work with the Division, do whatever he needs to do." Eric's attorney

---

[3] He also requested a paternity test regarding Eddie, which showed he was not the father of that child.

also asked for visitation to be scheduled once paternity was established. The Division did not object.

The trial judge engaged in a colloquy with Eric regarding the "road map" of the litigation and explained:

> [T]hat takes a couple of weeks to get a paternity test. You'll have to go and they just take some saliva or something like that. And, then, you're certainly entitled to be eligible to parent your child if you wish. The Division probably will have to assess you and I mean, that's kind of a harsh term, but they just have to see, you know, if things are appropriate. We just want the children to be in safe appropriate homes. And they'll have to establish a plan and a goal with respect to you. And . . . you have an attorney . . . and you have a caseworker. If you feel that, you know, you have questions that aren't being answered or anything along those lines you cal[l] your attorney. She's very good and she'll work with the State's attorney and try to resolve any of your issues. And anything that can't be resolved they'll bring to me and I'll resolve it.

The Division scheduled Eric and Nell for psychological evaluations for February 3, 2016 with Dr. Mark Singer, a licensed psychologist.

Having been informed that Eric was employed,[4] the judge stated he would try to set court dates that were as convenient as he

---

[4] Because Eric had represented to the caseworker he was unemployed, the Division asked him to provide information and pay stubs. Eric then clarified he was going to begin his employment the following week.

could around Eric's schedule. He repeatedly asked Eric if he had any questions and Eric replied he had none.

The judge told Eric he would like to schedule return dates every thirty days in the guardianship matter and asked Eric if he knew what his schedule was. Eric replied he did not know because the scheduler at work was out of town. After consulting with counsel, the judge scheduled the next appearance for February 12, 2016.

Eric appeared on the next hearing date. He had completed the paternity test on the previous day. Both Eric and Nell were scheduled for a psychological evaluation with Dr. Singer on February 15, 2016. The judge confirmed Eric knew where Dr. Singer was located and that the Division had provided him with a bus card to get there.

Observing that the guardianship case was one year old, the judge stated he had to set a trial date. The deputy attorney general (DAG) representing the Division demurred, explaining:

> [T]he problem with this is [Eric's] first appearance in this case was just when we last appeared.
>
> . . . .
>
> So we would have to give him an opportunity to engage in the litigation. He's presented himself as a plan and the Division did meet with him. But we're unsure of what's going

to happen with [Eric] because he just entered the litigation.

The judge inquired further to get a measure of what was necessary to get the case ready for trial. He asked Eric directly, "are you interested in parenting?" When Eric stated, "[y]es," the judge replied, "[g]ood." The judge ascertained the caseworker had been to Eric's residence and then said to the DAG, "[a]nd, so, you just need an evaluation of him?" She agreed and also stated there were a few other outstanding issues. The judge then addressed Eric again:

> THE COURT: All right. I'm going to still set trial dates and the Division will work with you and we'll see where we are come April, May.
>
> [ERIC]: All right.
>
> THE COURT: Okay? Do you have any questions for me by the way?
>
> [ERIC]: No, sir.

After learning Eric believed he was Adam's father even without the paternity test results, the judge asked about the apparent delay in his involvement in the litigation. The DAG advised Eric had been involved in the FN litigation for a brief time and then "went missing." The judge questioned Eric:

> THE COURT: Do you want to parent [Adam]?
>
> [ERIC]: Yes.

THE COURT:    And why were you not involved earlier in the litigation?

[ERIC]:       Because during that time the mother she had, you know, a lot of trouble. She didn't like my fiancée, so both of them was going back and forth at that time. So to not have no trouble I just told her look, I will visit him with you and that's how I see him. But she wouldn't let me come to her mother's house, because that's where she was staying. And her mother didn't want me there. So I couldn't see him at all.

[DAG]:        But the child was in placement and [Eric] was aware that the child was in placement, so I'm not speaking about the time when [Adam] was with the mother. It's when the child was in placement.

[ERIC]:       Oh, yes, about that. I was given a number to call the lady.

THE COURT:    For visitation?

[ERIC]:       Yeah, the lady, but every time I called, no answer.

        . . . .

THE COURT:    [Y]ou're not visiting with [Adam] though are you?

[ERIC]:       No.

THE COURT:    Well, do you want to?

10

[ERIC]:         Yes, I do, but I just didn't —
                I know where she lives, but I
                just didn't want to —

        . . . .

THE COURT:      So the Division will
                facilitate it. You don't have
                to go through the mother if you
                want visitation. You get your
                own visitation, do you
                understand?

[ERIC]:         Yes.

THE COURT:      Do you want that?

[ERIC]:         Yes.

THE COURT:      Are you going to go? We're
                going to set it up?

[ERIC]:         Yes.

THE COURT:      Okay. You have every right.

Eric and his family lost their home in a fire on February 15, 2016. Moulton testified the Division provided Eric with a list of resources to deal with the loss caused by the fire. She continued telephone contact with him while he was living in a hotel and, thereafter, with his sister.

Eric attended the next proceeding on March 10, 2016. Following receipt of the paternity test results, Eric was adjudicated to be Adam's father. Because Eric and Nell had been unable to attend the scheduled psychological evaluation as a result of the fire, the evaluation was re-scheduled for April 6. Eric

did not object to this date.  Once again, the judge addressed Eric directly and confirmed he knew the date and where he needed to go. The judge also explained, "[s]o the reason we need an evaluation is to see if anything needs to be done and what the issues are, okay?  So it's important you go on the sixth, April 6th."  The next hearing date was scheduled for April 13.

Eric did not attend the April 6 psychological evaluation or the April 13 proceeding.  The DAG advised the court the matter would not be ready to proceed on the scheduled trial date of May 4 because Eric had not yet completed the psychological and bonding evaluations.  Eric was reached by telephone, placed under oath, and provided the following explanation:

> The reason why I missed the appointment is because I went downtown local Penn Station and the 71 to Livingston came and I got on that one.  And when the lady told me that she doesn't go near the office I had got off and it was 1:30 at that time.  So I was at the other bus stop waiting for the correct bus and it didn't reach me until 3:30.  So I didn't want to appear at the office a whole hour late. So I called in for him to call me back and reschedule and I didn't get no call back that whole day.

The trial judge reminded Eric that it was his obligation to get on the right bus.  Eric's attorney represented she had tentative dates for defense evaluations for April 27 and 29.  While Eric was on the telephone, the trial judge expressed his

12

displeasure and frustration that the Division's expert was unable to schedule a new date for Eric's evaluations for two months and observed he would probably have to adjourn the trial because the evaluations were not completed. He asked the DAG to have Dr. Singer available by telephone for their next conference on April 18 if he could not fit Eric in for an evaluation for two months.

Eric did not attend the April 18 hearing. The DAG advised the court of the failed effort to have Eric evaluated that day. At her request, Dr. Singer had changed travel plans, paying a fee to change the plans, so he could conduct the evaluation of Eric that morning at 9 a.m. Eric was contacted and said he would be available. The DAG explained that the plan fell apart, however:

> Dr. Singer got a call this morning . . . a little bit after seven, [Eric] indicated that he wasn't sure what time he would be coming to the evaluation. He left Dr. Singer a phone number to reach out to him. Dr. Singer placed several calls to him and never got a response. The caseworker was able to get in touch with [Eric] and [Eric] indicated that he had a family emergency with <u>one</u> of his other children.

> [(Emphasis added).]

Eric's attorney explained his daughter suffered from sickle-cell anemia; Eric had been in the hospital all night and "[t]hey were scrambling to find child care for the other children so that his fiancée could stay with the child in the hospital while he

13

went to the evaluation." She represented Eric would get medical records to document the family emergency. No documentation of the medical emergency was ever provided.

Turning to scheduling, the judge asked the status of evaluations. The Division still required an evaluation of Eric by Dr. Singer. Eric's attorney represented the defense psychological and bonding evaluations had been rescheduled for May 10 and 17.

A case management review hearing was held on May 23, 2016. Eric had been scheduled for evaluation by Dr. Singer at 9:00 that morning the fourth scheduled date. He did not appear. The DAG advised that the case manager received a text message from Eric that morning saying he had a conference with one of his children. Eric's attorney said she had received a text message from him at about 6:30 a.m. saying his fiancée was sick and he had no one else to care for the children. She said, "[h]is fiancée is very sick in bed, so he's taking care [of the child] and I think he might have had to attend a school thing in her place." An effort to telephone Eric was futile, reaching only his voicemail.

Eric's attorney represented that the defense evaluations were completed on May 17 and asked that another attempt be made to schedule an evaluation by Dr. Singer. Arguing that Eric had made efforts to participate, she stated he wanted "an opportunity to

raise his son. And he understands the seriousness of the litigation and . . . we've had many frank discussions about the need for him to attend these evaluations which makes me feel as if these are legitimate excuses."

The judge then reviewed the chronology of missed evaluation appointments.[5] The first evaluation on February 15 was missed as a result of the fire, the occurrence of which was confirmed with the Red Cross. The second scheduled evaluation, on April 6, was missed because Eric got on the wrong bus. It was represented that Eric missed the third scheduled evaluation, on April 18, because two of his daughters were rushed to the hospital for sickle-cell anemia-related issues.[6] Despite his counsel's requests, he had not provided her with any documentation of that medical emergency. The two emails Eric sent on the morning of May 23 were then read to the court. The one sent to the Division at 9:45 a.m. stated:

> Good morning. Sorry, I missed your call. I was in a school conference for my son. I was going to call you but I'm driving[,] the bus card came up missing and I got to get . . . this truck back to my sister. So I won't make it to this appointment with Dr. Singer.

Eric's attorney reported she had been "very stern" with him about the need to attend the evaluation and believed he was going

---

[5] Nell also missed each of the scheduled evaluations.
[6] On April 18, the representation had been that one daughter was ill.

to attend because, in response to her advice, he stated, "no problem." Nonetheless, he failed to appear. Although the judge had consistently expressed sympathy and patience with the reasons previously proffered for Eric's failures to attend the evaluations, the conflicting reasons given for the failure that day presented a challenge to his equanimity. The judge questioned why Eric was "going to a school conference if he's home taking care of kids if the fiancée is sick," and further observed there was no answer when Eric was called.

The trial judge agreed to consider scheduling a fifth date for Eric's evaluation by Dr. Singer but cautioned that if he did not appear, Eric would forfeit his opportunity to present his own expert. He also required Eric to produce documentation of the sickle-cell anemia hospital visit. The judge scheduled the next conference for June 1 to determine if a fifth evaluation date would be scheduled.

Eric had notice of the June 1 conference but did not appear in person and was not available to participate by telephone. His attorney stated, "[h]e's taking care of his children and they're screaming and crying and he can't get to the phone." The DAG advised Dr. Singer could perform an evaluation of Eric on June 10. Eric's attorney stated she had stressed to him how important it was for him to provide her with documentation of his daughters'

hospitalization.  He replied they had lost the discharge papers and, although he agreed to get copies or provide the name of the doctor for her, he had failed to do so.  The judge asked the DAG if the Division was willing to give Eric a fifth attempt at the evaluation, and she answered, "[y]es."  The judge again emphasized that if Eric failed to attend a fifth evaluation date, he would be precluded from presenting his own expert.  He scheduled June 10 as the date on which Dr. Singer would evaluate Eric and, if Eric did not appear, the trial would proceed.

On June 7, 2016, Eric appeared at the Division office to obtain his bus card.  Moulton explained to him both the trial and his evaluation with Dr. Singer were scheduled for 9:00 a.m. on June 10.  He replied he had an appointment at 10:30 a.m. for Section 8 housing and he was concerned he would lose his housing if he missed that appointment.  Moulton understood the importance of that meeting but stressed the potential consequence of failing to appear for the evaluation, explaining that, at this trial, "we are going to terminate . . . parental rights."  She told him it was possible to work things out if he could come to court at 9:00 a.m., meet with the doctor and then leave.

Eric did not appear for the evaluation or for trial on June 10, 2016.

Although he had requested visitation with Adam once paternity was established, Eric's inconsistency in appearing for scheduled events also adversely impacted his visits with Adam. From the time he was adjudicated Adam's father until the trial, Eric had only two hours of supervised visitation and did not avail himself of any visits with Adam at the foster home even though he had the ability to do so. He failed to attend scheduled intake appointments to initiate visitation on March 22 and 24, 2016. When Eric did not show up for the first appointment, the caseworker called him. He stated he was unable to attend because he did not have child care for his children. When Eric neither appeared nor called for the second scheduled appointment, the caseworker contacted him again. He sent a message that he had received a call for a job interview and could not miss the interview. It was not until the third scheduled appointment that Eric attended the intake appointment.

On March 30, 2016, Eric had a supervised visit with Adam at the Division. The caseworker met with Eric, discussed rescheduling his intake appointment, informed him of the scheduled bonding evaluation and gave him a bus card for the evaluation. Eric had another visit with Adam on April 5, 2016. Each of the visits with Adam were positive.

18

A visit scheduled for May 17, 2016 was canceled because Eric was scheduled for the defense bonding evaluation. Eric failed to appear for the next scheduled visit on May 24, 2016, and, when he was called, stated he "forgot about today's visit and will not be able to make it." A visit scheduled for May 31 was canceled because Eric failed to confirm the visit twenty-four hours in advance.

At the time of trial, Adam had been living with Maisie for approximately two years. Moulton described Adam as having special needs. He was diagnosed with attention-deficit/hyperactivity disorder (ADHD), and was receiving services that included individual therapy, in-home behavioral assistance and speech therapy.

Dr. Singer was qualified as an expert in psychology and bonding. He conducted a bonding evaluation between Maisie and all three children. He found their interaction to be "very consistent with what is commonly seen between three children and a healthy attachment figure." The children used Maisie as a secure base for engaging in exploratory behavior. "Smiling and laughter were plentiful." Maisie was very proactive, "praised the children very appropriately and the children appeared to . . . respond appropriately to the praise." They sought her assistance in their play and she provided appropriate assistance and structure. Dr.

Singer interviewed Nick and Adam, who both stated they wanted to live with Maisie and that they were not having any visits with their biological parents. Dr. Singer concluded:

> [Maisie] has become the psychological parent for all three children. The data suggests that they have a very secure attachment. And should that relationship be severed there would likely be some significant negative consequences to severing a relationship between the children and their psychological parent.

Dr. Singer noted the children enjoyed an added benefit by the fact that all three children were together, giving them "an opportunity to foster a relationship amongst themselves." He opined it would be a "significant loss" for Adam to lose those relationships.

Dr. Singer anticipated that if their relationship with Maisie were severed, "the children would regress both emotionally and behaviorally." He expected the "children would experience feelings of loss, feelings of sadness, low self-esteem" and "have difficulty forming meaningful attachments later in life." The harm caused would be significant and enduring. This would be even "more complicated" for Adam because he had some behavioral issues, was exposed to lead, had some speech issues and had an Individual Education Program (IEP) in school. Dr. Singer opined "that any of those deficits . . . would be exacerbated should this child

lose his relationship with . . . what appears to be his only consistent healthy caregiver."

Because Eric never appeared for any of his scheduled evaluations, Dr. Singer never met him. Dr. Singer stated Eric's failure to make any of the appointments "raises concerns regarding his ability to make the kind of commitment that [Adam] would need in terms of having a safe, stable, healthy parental figure in his life."

Dr. Singer opined a failed reunification would "add to the inconsistency" the three children had experienced in their lives. He noted the extreme importance of permanency in providing the kind of consistency children need to grow, benefiting them in developing self-esteem and even improving academic performance. He stated the Division should not delay further in establishing a permanent plan for the children and agreed with the Division's goal of termination of parental rights and adoption of the children by Maisie.

Moulton testified the Division did not refer Eric to any services other than visitation and the psychological evaluation

because, without experts' recommendations, the Division was unaware of what services were needed.[7]

## II.

Termination of parental rights is warranted when the Division establishes by clear and convincing evidence that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a) See N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 168 (2010).]

---

[7] Moulton acknowledged she was aware that Eric was employed in construction and worked long hours. She had provided him with a letter documenting his court cases for his employer as he had requested.

These "four criteria . . . are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). Notably, the best interests standard is applied in light of "New Jersey's strong public policy in favor of permanency." Id. at 357. "[T]he child's need for permanency and stability emerges as a central factor." Ibid.; see also In re Guardianship of J.C., 129 N.J. 1, 26 (1992).

Eric argues the order terminating his parental rights should be reversed because the Division failed to prove the four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. We disagree.

As a preliminary matter, we note that great deference is afforded to the Family Part's findings of fact and conclusions of law based on those findings. N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008); N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 79 (2007). In this case, the findings of fact are based upon the evidence presented by the Division, which were unrefuted by any evidence presented on behalf of Eric and, in fact, were corroborated by Eric's admissions at compliance review hearings.

III.

The first two prongs of the statutory test are interrelated.

A.

Harm, as addressed by the first prong, "involves the endangerment of the child's health and development resulting from the parental relationship." K.H.O., supra, 161 N.J. at 348. Eric argues that this prong was unproven because he never harmed Adam and he further faults the Division for failing to locate him and using only "perfunctory efforts" to do so.

To satisfy this prong, the Division "does not have to wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 449 (2012) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)). "The harm shown . . . must be one that threatens the child's health and will likely have continuing deleterious effects on the child." K.H.O., supra, 161 N.J. at 352.

"[T]he attention and concern of a caring family is 'the most precious of all resources.'" D.M.H., supra, 161 N.J. at 379 (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 613 (1986)). "A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that

24

endangers the health and development of the child."  Ibid.; see also K.H.O., supra, 161 N.J. at 352-54.

The trial judge made the following findings as to the first prong of the analysis:

> [Eric] simply has been not available to his child and, also, has no plan.  The Court finds he has, in fact, withheld his, love, nurture and solicitude at a time period where he knew or certainly should have known . . . that the Division had custody . . . of his child.  The caseworker was clear that the evidence the affidavit establishes that [Eric] knew that the Division had removed [Adam]. [Eric] knew [Adam] was in trouble because of the fact that [Adam's] mother didn't take him to the doctor for two years and that, [Adam] was either back with his mother in the first instance and, then, removed.  And [Eric] currently had no plan and wasn't available.

> In fact, he gave the Division incorrect information, never updated his information with the Division.  And the Division did everything they could to find him.  They did an affidavit search and it was unsuccessful. And [Eric] despite the fact knowing that the Division has his child never appeared and never planned, clearly, his being unavailable for his child, not planning for his child, letting his child remain in foster care without getting involved, not contacting the Division, not being involved in any way, shape or form is withholding love, nurture and solicitude.  A recognizable and cognizable harm in New Jersey.  And I find the Division has established that clearly and convincingly.

> . . . .

> I, also, note . . . that a child may experience continuous psychological damage if

deprived of a permanent home and identity. And, clearly, [Eric] failed to provide a permanent type of home for [Adam], which is further harm. And as indicated jeopardizes and harms the child's health and development.

And I do find that not only [has Eric] harmed the child's health and development, but that it's likely to continue in the future and continue to be endangered . . . . I'll go into that a little bit more in Prong [three]. I went into it a little bit before with the facts. But, clearly . . . . [Eric] has been simply unavailable and missed five attempts to have him evaluated as well. Therefore, the Division has satisfied Prong [one] clearly and convincingly.

B.

Under the second statutory prong, "[n]o more and no less is required of [the parents] than that they will not place their children in substantial jeopardy to physical or mental health." A.W., supra, 103 N.J. at 607. In other words, "[t]he Division must demonstrate that the parent is 'unable to eliminate the harm facing the child or is unable . . . to provide a safe and stable home for the child' . . . before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div.) (alterations in original) (quoting N.J.S.A. 30:4C-15.1(a)(2) and J.C., supra, 129 N.J. at 10), certif. denied, 171 N,J. 44 (2002).

Eric argues the trial judge erred in finding this prong satisfied by his "failure to come forward." He submits that, "as

soon as [he] was made aware and served the FG Complaint, he appeared three days later at the January 14, 2016 court hearing and expressed his interest in caring for his son again."

The trial judge found the Division satisfied the second prong clearly and convincingly:

> [Eric's] unwillingness to attend any type of service speaks volumes of [his] unwillingness to address the reasons why [Adam is] not in [his] care.
>
> [Eric] simply has never come forward. He's avoided the Division by giving information that either was incorrect or soon became incorrect and never updated it. The Division through a search could not even locate him. And he's never sat down and met the Division to establish a plan. The best the Division could do was get him into an evaluation to see what services he needed. But, unfortunately, he never complied with that. He was, basically, missing in action, MIA, is what I put in my notes, at the removal time, all the way up through January 2016. And, then, when he appeared in 2016 he was still noncompliant.
>
> In addition, he had ample opportunity to even attend visits with [Adam]. The testimony was that even though the caregiver is not his direct relative the caregiver was wil[l]ing to have open and liberal visitation and supervise it. But he never took advantage of that. Then, the Division said, fine, they will set the visits up at Tri-Cities. [Eric] missed the intake. And, consequently, the visits were, then, at the Division's office. And he only attended two visits during that whole time period. That clearly demonstrates an inability or unwillingness to eliminate the harm facing the child.

27

C.

The record here supports the finding that Eric voluntarily withdrew from Adam's life for substantial periods of time. He was fully aware of the medical neglect Adam had suffered while in Ali's care when he brought Adam to the pediatrician in April 2012. At that time, Eric learned Adam had not been to the doctor in two years, was behind in his immunizations, undernourished, half the normal weight for a child his age, and his speech was delayed. He also knew that Ali had frustrated his efforts to secure medical attention for Adam by failing to provide his medical card. It is evident Eric was capable of recognizing and caring for Adam's needs because, during the time Adam lived with him, Eric followed up with all his medical appointments and saw to it that Adam received appropriate medical treatment, including getting him up to date with his immunizations. A continuing theme in the Division's reports is that there were no concerns for Adam's well-being when he was living with Eric.

Nonetheless, when Ali had another child in June 2013 and claimed Eric was the father, Eric returned Adam to the home where he had been neglected in order to mollify Nell. There is no evidence he did anything to ameliorate the risk of harm to Adam that living with Ali posed.

28

It is reasonable to infer Eric was aware Adam had been removed from Ali's care in April 2014 because he was present at her house when the Division caseworker appeared for an unannounced visit in June 2014. Despite the urging of the caseworker to attend a Family Team Meeting and her follow-up call to him, he did not attend, proffering an as yet unsubstantiated excuse that his grandmother was in the hospital. Although the caseworker provided her contact information and emphasized the need for Eric to remain in contact with the Division, he remained incommunicado from June 2015 until January 2016, when the Division was able to contact him through his grandmother.

Thus, from July 2013, the time he returned Adam to the care of a person Eric knew had neglected him, until January 2016, the only initiative Eric took to reach out to the Division was the phone call he made after his grandmother contacted him to inform him the Division was seeking him. It is no excuse that he did not know about the FN litigation because he admitted to the judge he did not get involved or see his son because of the friction between Ali and Nell. He also admitted he knew where Adam was in placement and had the telephone number for his resource mother but failed to pursue visits with Adam when he called and got no answer.

It cannot be disputed that Eric was fully aware of the guardianship trial as of January 2016. The guardianship action was

29

close to one year old at that time and the judge was understandably concerned that a trial be scheduled to achieve permanency for Adam. Still, both the judge and the Division were admirably respectful of Eric's rights. The Division reminded the judge that Eric had just appeared, "presented himself as a plan" and had to be given "an opportunity to engage in the litigation." When Eric stated his interest in parenting Adam, the judge responded, "[g]ood," and provided him with a road map of the litigation process.

From his initial appearance in January 2016 through trial, the record is replete with evidence that the judge, the Division and even Eric's own attorney repeatedly advised him of the importance of appearing for scheduled evaluations, explained why the evaluations were important in the litigation, confirmed he knew where he had to appear and had the means to do so. He was not prejudiced by his one excusable failure due to the fire. Rather, he was given four more opportunities to attend, all accompanied by urgent advice as to the importance of his participation and the consequences for failing to appear.

As for the final opportunity, on the day of trial, the caseworker had stressed the hearing was to address the termination of parental rights and the judge had made it clear Eric would be foreclosed from presenting his own expert if he failed to appear for evaluation by Dr. Singer. Admittedly, Eric had a potential

conflict that day but, as the caseworker advised him, it was not insurmountable and they could work it out, provided he showed up as required for the 9:00 a.m. evaluation.

We derive two conclusions from this record. First, Adam was exposed to a risk of harm from his relationship with his father. That harm was presented by Eric's voluntary withdrawal from Adam's life and responsibilities for his care after Eric knowingly permitted Adam to return to a home where he had been profoundly neglected. Second, we conclude Eric lacks the ability or inclination to overcome this inattention and become a responsible parent to Adam. We are cognizant Eric suffered the loss of a fire and has significant other responsibilities associated with the family he has with Nell. But Adam deserves a parent who puts his needs on a footing that is at least equal to the demands placed on Eric by these other family relationships. Even if we accord any credence to Eric's stated but unsubstantiated reasons for failing to attend evaluations and visits with Adam, those reasons reveal the very low priority Eric gave to building or even merely staving off the termination of his parental relationship with his son. In our view, there was ample evidence to satisfy the first and second prongs of the best interests test.

IV.

31

The third prong of the best interests standard contemplates the Division's efforts to reunify the parent and the child by assisting the parent in addressing the problems that led to placement. K.H.O., supra, 161 N.J. at 354. Such efforts include:

(1)  consultation and cooperation with the parent in developing a plan for appropriate services;

(2)  providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3)  informing the parent at appropriate intervals of the child's progress, development, and health; and

(4)  facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

The Division's efforts are measured not by their success but against the standards of adequacy in light of the family's needs in a particular case. D.M.H., supra, 161 N.J. at 390. When a parent "refuse[s] to engage in therapy or other services," that factor suggests efforts to reunite the family are no longer reasonable. A.W., supra, 103 N.J. at 610 (quoting Richard Ducote, Why States Don't Terminate Parental Rights, Justice for Children 3 (Winter 1986)).

The trial judge found the Division proved the third prong by clear and convincing evidence:

> [D]espite the fact that [Eric] knew based on the testimony of the caseworker and the affidavit of the fact that his child was in custody [he] did not make himself available. And, consequently, was unavailable for any type of service. When he did make himself available in January of 2016 he was immediately referred to an evaluation, again, so services could be put in place and tailored for him. Unfortunately, he had five attempts at those evaluations and never -- never made it, never attended. And, of course, as I indicated there were two searches for him as well.
>
> . . . .
>
> As far as alternatives, the Division has considered a relative, [S.K.] and the Division, also, spoke to the caregiver about [kinship legal guardianship] as an alternative to adoption. The caregiver expressed [that her] desire and preference is for adoption.

Eric argues that the trial judge erred in making this finding. He contends the Division "failed to tailor its services to the father," stating, "[a]s soon as he was served and understood that his son was in foster care . . . he availed himself by attending court hearings and being tested for paternity." He also argued that the Division conducted an inadequate search for relatives for Adam's placement and criticized the foster mother as an inappropriate placement.

Regarding the court-ordered evaluations, Eric did not argue before the trial court or in this appeal that the evaluations ordered by the trial judge were unnecessary; that it was

unreasonable for the judge to require them or that the requirement interfered with his ability to parent Adam. Rather than challenge the reasonableness of the ordered evaluation, Eric argued his noncompliance was excusable.

As Moulton testified, Eric's failures to participate in the psychological evaluations thwarted any effort by the Division to determine what services were appropriate to assist in reunification. Even without the evaluations, the Division was able to respond to Eric's needs when he maintained contact, providing a bed for Adam, a list of resources to deal with the loss caused by the fire and bus cards to enable him to attend evaluations.

Eric's argument that the Division failed to adequately consider alternatives to termination lacks any merit. The Division initially placed the children with a maternal cousin, who asked they be removed four months later. At that time, Eric's whereabouts were unknown and the children were placed with another resource suggested by Ali. Eric now contends the Division was required to conduct an exhaustive search for a relative who could care for Adam and states the Division should have considered Eric's mother because it had her contact information. We do not agree that the Division has such an obligation. We note further that

34

there is no evidence that Eric suggested her as a placement or that she volunteered for placement.

V.

Lastly, the fourth prong addresses whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The focus of this prong is whether the child will suffer a greater harm from the termination of ties with the natural parent than from the permanent disruption of the child's relationship with the foster parent. K.H.O., supra, 161 N.J. at 355.

Eric argues it was error for the trial judge to find this prong satisfied because Adam "knows his father," spent one-third of his life with his father and is "comfortable and excited" to be with his father and his family.

The trial judge found this prong was satisfied by clear and convincing evidence, as well. Although the judge observed comparative bonding evaluations were not available because Eric had failed to attend any bonding evaluation, the court did have "the uncontradicted testimony of Dr. Singer," who had interviewed Adam and conducted a bonding evaluation with Maisie.

> [Dr. Singer] noted that there was a secure attachment. He noted that the children view her as the psychological parent. He noted that there would be harm if that relationship was terminated. There would be

35

enduring harm. The children would regress. [Adam's] special needs . . . would be enhanced. And in the long term there would be experience of loss, sadness and low self esteem.

There is no known parent who can at this point mitigate that harm.

Dr. Singer, after reviewing all of the facts before him and the data concluded that the children need permanency and that they would benefit from permanency. And that further delay would not be in the children's best interest.

He, also, noted in his report that the children are progressing through the age where primary attachments internalize and where there is no other attachment figure to mitigate the harm if the children lose their relationship with their psychological parent. That there would be significant and enduring harm suffered to the children.

Again, resulting in feelings of loss, insecurity, low self esteem, and having difficulty forming meaningful relations later in life.

On the other hand, the children have an opportunity here to be together with each other and to achieve permanency. There is no other vehicle or avenue for these children to achieve permanency at this point in time. The good from that permanency clearly outweighs any harm that could result from the termination of . . . [Eric's] rights to [Adam]. . . .

The unrefuted evidence here is that Adam has an emotional attachment to Maisie, who wants to adopt him and his siblings, and he wants to continue to live with her. The emotional bond and the

quality of care provided by Maisie have resulted in her becoming Adam's psychological parent, the only healthy caregiver he has known in his life. Dr. Singer testified Adam would suffer a significant and long-term harm if that relationship were severed, and, because of his special needs, the impact on him would be greater than that on his siblings. No evidence was presented to suggest Eric, an inconsistent presence in Adam's life, has any ability to ameliorate the harm Adam would suffer.

"We will not disturb the family court's decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings." E.P., supra, 196 N.J. at 104 (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). There is ample evidence here to support the court's findings.

## VI.

Our dissenting colleague concludes that termination is not warranted here because Eric was not afforded a meaningful opportunity to reunify with his son. He cites: failures in service regarding the Title 9 and guardianship complaints, Eric being precluded from visits unless supervised and the court's requirement that he undergo a psychological evaluation, which our colleague describes as neither necessary for reunification nor helpful in determining Eric's ability to care for his son.

We agree that courts should not adopt recommendations of the Division for evaluations in a knee-jerk fashion without consideration of their usefulness in a given case. In this case, however, the need for Eric to attend an evaluation was never challenged in the trial court or on appeal. To the contrary, trial counsel repeatedly represented to the court that she had emphasized the importance of attending the evaluation to Eric, even commenting on one occasion that she had been "very stern" with him and he understood the importance of compliance. On appeal, again, there has been no challenge to the reasonableness of this requirement, only an argument that Eric's failure to comply was excusable. And, Eric's failure to cooperate deprived the court of a bonding evaluation between him and Adam, an evaluation our colleague agrees is necessary.

Whether the ordered evaluations or supervised visitation were necessary or not, we disagree that the orders deprived Eric of a meaningful opportunity for reunification or thwarted any effort of his to fortify his relationship with his son. The record reflects an admirable patience on the part of the trial judge, repeatedly expressing a commitment to assist Eric in visiting with his son.

Both Eric and our dissenting colleague fault the Division for failing to find Eric and include him in the ongoing litigation.

In this, as in providing services generally, we believe the Division's efforts should not be measured by their success but by their reasonableness. The affidavit of inquiry filed in January 2015 shows the Division attempted to find Eric at his last known address, conducted numerous inquiries of databases, identified four other addresses for him and sent mail, both regular and certified, that was returned as undeliverable and marked "[r]eturn to sender, attempted — not known, unable to forward." A caseworker also visited addresses in an effort to locate defendant and was finally able to make contact after Eric heard from his grandmother that she was looking for him.

Eric's own statements and conduct cannot be ignored in assessing the reasonableness of the Division's efforts and whether the orders thwarted reunification. Eric stated, under oath, that he knew Adam was in placement, he knew where he was living and had the telephone number where he could call him. Still, he did not attempt to visit Adam during that extended time when there were no orders in place. Given his admitted knowledge that his son was in placement and the absence of any barriers to his visiting him during that time, the limited nature of Eric's relationship with his son cannot be laid at the Division's door.

We appreciate that, among the many failures to attend evaluations and intake appointments, there was a fire precluding

A-4577-15T2

Eric's participation on one occasion and reasons given on other occasions that appeared plausible. But, there were also excuses that were conflicting, undocumented and strained credulity. And, even if given credence, the excuses given did not reflect a high priority for achieving reunification. The record thus provides more than ample support for the conclusion that Eric's absence from Adam's life was voluntary, not the product of any inhibiting effect caused by the court's orders and further, that Eric's absence constituted a harm he was unable or unwilling to eliminate.

Our colleague also states I.S. compels a different result.[8] We disagree. Supra, 202 N.J. at 145.

C.M., the father in I.S., learned in December 2006 that he had fathered a child out of wedlock, who was born eight months earlier and had been removed from the care of the mother. Id. at 155. C.M. was married with four children. Ibid. The ensuing conflict with his wife presented C.M. with what the Supreme Court termed a Hobson's Choice, choosing between his newborn son and his established family. Id. at 151. Although C.M. did not request custody of his son because his wife would not accept that outcome, he identified two placements for the child, a friend in the Dominican Republic and his sister. Id. at 157-58. The Division

---

[8] Eric did not cite I.S. in support of his arguments on appeal.

rejected the possible placement in the Dominican Republic and offered no assistance to C.M.'s sister to improve her housing circumstances to accommodate the child. Ibid.

This lack of responsiveness to C.M.'s predicament was echoed in the trial court's colloquies with him, which can be characterized as accusatory and judgmental in nature. When C.M. said he wanted his son to live with his sister, the judge suggested he should walk away from his marriage to care for the baby, making statements such as: "Why don't you kick your wife out and take your son home? This is your son, you made the baby, you be responsible for him"; "Take the baby, you made the baby and have your wife leave." Id. at 159. When C.M. answered that he had more children with his wife, the judge asked, "Why did you have another child with" the child's mother and, in response to C.M.'s statement that "accidents" happen, the judge stated, "[accidents] shouldn't happen." Ibid. (alteration in original). The trial judge rejected the need for a bonding evaluation or psychological evaluation, in apparent agreement with the Division's stated goal in the guardianship trial: "adoption, not custody transfer, not anything, it's adoption." Id. at 160.

The efforts of the Division and the trial judge to engage Eric in the process stand in sharp contrast to the scenario in

I.S.   But, an even more important distinction lies in the difference between the efforts made by C.M. and Eric.

C.M. was told by the Division that, to obtain custody of his son, he would have to secure a two-bedroom apartment.  Ibid.  He did so.  Ibid.  He was also told he had to secure someone to care for the child while he was at work.  Ibid.  He identified a person he trusted who had a license to take care of children.  Ibid.  He also stated he would allow his son's relationship with his foster parents to continue in appreciation for what they had done.  Ibid.  When asked how committed he was to care for his son, he responded, "[a] hundred percent."  Ibid.

In short, C.M. took affirmative steps to satisfy any condition the Division set for him.  Sadly, the same cannot be said for Eric.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4577-15T2

_____

**GUADAGNO, J.A.D., dissenting.**

Distilled to its essence, the majority opinion affirms the termination of parental rights of an admittedly fit parent, who was not considered for placement when his son, Adam, was removed from his mother's custody; was never served with the Title 9 complaint in that matter; was not served with the subsequent guardianship complaint for over one year; was not permitted to see Adam unless his visits were supervised; and was ordered to submit to a psychological evaluation that was neither necessary for reunification nor helpful in determining his ability to care for his son. Because the Division failed to prove the four prongs of the best interest test, N.J.S.A. 30:4C-15.1(a), I respectfully dissent from the decision affirming the termination of the father's parental rights.

The mistakes that have plagued this case began during the Title 9 proceedings. The Division became involved with this family in April 2012, after the father, Eric, took Adam to the child's pediatrician, Dr. Sundaram, with a severe case of eczema. The doctor was concerned, as he had not seen Adam in two years and contacted the Division because the child was underweight and had not received timely vaccinations.

Adam had just started living with Eric in March 2012. It is not disputed that the child was well cared for while in Eric's custody between March 2012 and July 2013, and that Eric fully addressed the medical neglect the child suffered while in his mother's care. A follow-up interview with Dr. Sundaram in November 2012 indicated that Adam was seen in October 2012 and was up-to-date with immunizations with no recurring illnesses. The doctor told the caseworker that Eric provides "adequate and appropriate care" and he had no concerns of abuse or neglect.

Adam returned to live with his mother, Ali, in July 2013, after Eric's fiancée, Nell, learned that Ali had accused Eric of fathering another child with her. The Division filed for care and supervision of Adam and two of Ali's other children in December 2013, because Ali had not addressed her marijuana use. Although Eric was named in the order to show cause as a dispositional defendant, he was not served with the complaint and did not appear.

A compliance review was held on April 9, 2014. As with the four preceding court appearances, Eric was not noticed and did not appear. Yet without any reason or apparent justification,[1] the FN

---

[1] The transcripts from the Title 9 litigation have not been provided to us and we have only the court orders to inform our review.

judge ordered that any visits Eric might have in the future with his son would be limited to once a week and had to be supervised.

When the Division removed Adam from Ali's custody in April 2014, he was placed with Ali's cousin, S.K. There is no indication in the record that any effort was made to contact Eric, let alone place the child with him. The majority excuses this failure by claiming Eric's whereabouts were unknown at the time. Ante at __ (slip op. at 5). However, Division records from 2012 contain two addresses where Eric was living: a Vermont Avenue address in Irvington, and a Schuyler Terrace address in East Orange.

A caseworker visited the Irvington address on September 5, 2012, when Adam was still residing with Eric. The caseworker described the Irvington address as a three-bedroom apartment, and reported that Eric was working as a self-employed carpenter earning $400 per week, Adam and his step-siblings had shoes and clean clothes with adequate food, and "the home [was] neat and clean, and there [were] no concerns."

A Division report dated April 9, 2012, lists an additional address for Eric at Schuyler Terrace in East Orange, but the January 8, 2015 affidavit of inquiry does not indicate that any letters were sent to that address. Not until January 2016 did a caseworker send a "search letter" to Eric at the Schuyler Terrace address. Eric immediately responded and informed the caseworker

3

that Schuyler Terrace was his "permanent address."  The Schuyler Terrace address appears nowhere in the affidavit of inquiry, even though the Division had a record of it as one of Eric's residences as early as 2012.

The majority suggests the Division's efforts to locate Eric, as evidenced by the caseworker's affidavit of inquiry, should not be measured by their success but by their reasonableness. Ante at __ (slip op. at 40).  The record demonstrates that the Division's efforts were neither successful nor reasonable as the Division had Eric's address in its files since 2012.  The Division alone must bear the responsibility for the failure to notice and serve Eric.

When Adam was removed in April 2014, Eric had demonstrated that he had capably parented his son for over one year, he had been employed as a carpenter, had adequate housing, suffered no substance abuse issues, and had no history of any psychological impediments.  Eric should have been the first option for the placement of Adam, yet the Division made no efforts apparent in the record to find him.

When a caseworker encountered Eric purely by accident on June 18, 2014, he failed to obtain Eric's address, did not serve him with a copy of the Title 9 complaint, and did not advise him of his right to have counsel appointed.  The Division does not dispute that Eric was never served with the Title 9 complaint.

4                                            A-4577-15T2

The guardianship complaint was filed on February 19, 2015. The first court appearance occurred on March 26, 2015. The FG judge entered an order indicating incorrectly that Eric had received notice of the proceeding, while another portion of the order indicates the Division had not yet served any of the named fathers. The transcript confirms that the caseworker told the judge the Division was still trying to "find" Eric.

On January 11, 2016, Eric learned the Division was attempting to terminate his parental rights, not from the Division, but from his grandmother, who had been contacted by caseworker Moulton. Eric immediately called Moulton and met with her later that day. Eric was advised of the next court date, January 14, 2016, which he attended with counsel.

Eric told the judge that he had housing, was currently caring for six children, was beginning a new construction job, and wished to be considered as a placement for Adam. Without any explanation, the deputy attorney general (DAG) informed the judge that the Division had already scheduled psychological evaluations for Eric and his fiancée. The only justification presented by the DAG for the evaluation was that Eric "has not been involved in this litigation." The judge indicated that Eric would be given visitation, but there was no discussion on the record as to the type of visitation, the duration, or frequency.

In February 2016, Eric's home was destroyed by fire. This and a host of other reasons, including the unavailability of the psychologist,[2] a lack of transportation, a sick child who was hospitalized, and his employment, kept Eric from attending the psychological evaluation. As often happens, the tail of this so-called "service" began to wag the dog of reunification, and Eric was not permitted any meaningful time with his son until this unnecessary psychological evaluation was completed.

The majority agrees that courts should not adopt recommendations of the Division for services in a knee-jerk fashion without consideration of their usefulness, but argues that ordering a completely unnecessary psychological evaluation was somehow acceptable because defendant did not object. Ante at __ (slip op. at 38). I disagree. Judges have an independent obligation to determine whether a service is necessary before ordering it. See N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 178 (2008) (criticizing parenting classes ordered for a man who had successfully raised four children as "utterly

---

[2] When the FG judge was told the psychologist could not see Eric for two months, he remarked the doctor's unavailability was delaying trials and having a negative effect on permanency: "That's unacceptable. I don't know how many cases he's taking or how many cases he's doing with the Division. But he's . . . [a]ffecting permanency in a docket type where the legislation has required three months for FG trials."

irrelevant"). This obligation exists whether or not a party objects.

In addition, Dr. Singer, who never met Eric, nevertheless was permitted to testify at trial that Eric's failure to attend an evaluation with him "raises concerns regarding his ability to make the kind of commitment that [Adam] would need in terms of having a safe, stable, healthy parental figure in his life." The judge concluded that because Eric failed to attend the psychological evaluation "the Division was not able to refer him for services because they didn't know what services he needed." The judge never acknowledged that Eric had successfully parented his son without incident for over one year. Had the judge considered this, he may have reasonably concluded that Eric was not in need of any services. The judge's conclusion suggests that all parties who appear in Title 9 and 30 litigation are in need of services, and the Division is incapable of recommending these services without the guidance of a psychological evaluation. Eric was named in the Title 9 complaint as a dispositional defendant and there were never any allegations of abuse or neglect against him. When Eric appeared in the guardianship litigation, there was no indication he was in need of any services and the DAG's claim that he "has not been involved in this litigation" did not warrant a psychological evaluation.

Dr. Singer followed his assessment in absentia of Eric by an equally bizarre and totally inadmissible bonding conclusion. Dr. Singer opined hypothetically that if Adam was bonded to Eric, as Adam is with his foster parent, "losing one relationship while maintaining the other relationship would likely serve to mitigate the harm."

The judge adopted this conclusion, finding:

> if [Adam's bond with Eric] was as strong as the caregiver's bond that one could mitigate the other. In other words, that assuming there was a bond . . . the caregiver would be able to mitigate that harm from the termination of the biological rights of the parents.

The objections to Dr. Singer's testimony should have been sustained, and his opinion, which is based on his unilateral finding that Adam enjoyed a strong bond with his foster parent, is insufficient to support the judge's conclusion that the Division presented clear and convincing proof under the fourth prong.

In N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 439 (App. Div. 2009), we held that "the fact that the child has a strong relationship with the foster parents is not by itself enough to terminate parental rights." A.R. also involved a bonding evaluation coincidentally performed by the same Dr. Singer on behalf of the Division where only the child and foster parents were evaluated. Id. at 429-30. When asked at trial if the child

8                                                          A-4577-15T2

would experience harm if the court severed his relationship with his foster parents, Dr. Singer responded "that the child would experience both significant and enduring harm." Id. at 430. Because his foster parents "are his central parental figures," Dr. Singer testified that the child "would experience a lot of emotional and behavioral regression in the short term and a feeling of insecurity, a feeling of low self-esteem, feelings of sadness in the long term." Id. at 430-31.

In affirming the trial court judgment denying the termination of the mother's parental rights, we noted "the child's relationship with foster parents 'must be viewed not in isolation but in a broader context that includes . . . the quality of the child's relationship with his or her natural parents.'" Id. at 439 (quoting Matter of Guardianship of J.C., 129 N.J. 1, 18 (1992)).

If the unnecessary psychological evaluation did not present enough of a hurdle to Eric's reunification, the FG judge also ordered that Eric's visits with his son had to be supervised. Again, no explanation or justification was offered by the Division or found by the judge for this needless restriction to a parent who had already demonstrated to the Division that his parenting of Adam raised "no concerns."

In I.S., supra, 202 N.J. at 176, the Court provided a detailed guide to the "diligent efforts" the Division was required to make

A-4577-15T2

in assisting parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure.

The similarities of the facts in <u>I.S.</u> to those here are striking, particularly the Division's insistence and the FN and FG judges' unexplained and unjustified concurrence that Eric's visitation be supervised. As the <u>I.S.</u> Court explained:

> The standard for whether visits should be supervised is also set forth in DYFS's own regulations. They unequivocally provide that "[u]nless [DYFS] or the Superior Court, Chancery Division, Family Part finds a need for supervision, visits shall be unsupervised." <u>N.J.A.C.</u> 10:122D-1.10(b). The regulations also require that "[i]f visits will be supervised, the plan shall contain a statement of the reason supervision is required." <u>N.J.A.C.</u> 10:122D-1.10(c).

> [<u>I.S.</u>, <u>supra</u>, 202 <u>N.J.</u> at 179.]

As in <u>I.S.</u>, there is no apparent reason in the record before us to justify the FN judge's decision to restrict Eric's visits with his son.[3] Similarly, the FG judge compounded this mistake by simply accepting the Division's recommendation for supervised visits without making any of the required findings. Too many cases involving knee-jerk requests by the Division for unnecessary

---

[3] The FN orders contain no justification or explanation for supervised visits and, as previously mentioned, the Title 9 transcripts were not included in the record on appeal.

services, particularly psychological evaluations, followed by rubber-stamping of these requests by the courts without questioning the actual need for these services, convince me that the Court's direction in I.S. has fallen on deaf ears.

Like the defendant in I.S., Eric had children with two different women. The defendant in I.S. failed to offer himself as a resource to his son, who was conceived out of wedlock, when he initially chose to remain with his wife. Id. at 182-83. Here, Eric returned Adam to Ali at his fiancée's insistence, after Ali falsely accused Eric of fathering her latest offspring. The majority employs unnecessary hyperbole in accusing Eric of permitting "Adam to return to a home where he had been profoundly neglected." Ante at __ (slip op. at 31). In fact, Adam was undernourished in Ali's care and she failed to provide the child with timely immunizations. The Division did not consider these issues "profound" enough to remove Adam, who remained with Ali for over one year while under the Division's care and supervision. Ultimately, Adam was removed because Ali refused to stop smoking marijuana. Again, I.S. comes to mind:

> Because defendant somehow made the "wrong" choice, he was to be denied his child, a child defendant appears more than capable, willing and able to rear. That result runs contrary to the entire legislative and jurisprudential scheme developed to handle this most sensitive

of topics: the termination of a parent's rights to his or her natural child.

[I.S., supra, 202 N.J. at 182-83.]

Eric made his first appearance in the FG proceeding after he was served with the guardianship complaint more than one year after it was filed. By this time, the FG judge was anxious to try this case as the three-month statutory mandate for trial had been exceeded. See N.J.S.A. 30:4C-15.2 ("A final hearing for guardianship shall be held within three months from the date the petition is filed with the Family Part.").

Although Eric had no history of any psychological issues and nothing in the record indicated the need for a psychological evaluation, the Division requested, and the FG judge ordered Eric to attend such an evaluation. Not only was this evaluation completely unnecessary, it needlessly delayed any chance Eric had to reunify with Adam.

To be clear, I do not question the need for bonding evaluations after a guardianship complaint has been filed. As the Court previously held:

> [T]o satisfy the fourth prong, the State should offer testimony of a well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents.

> [<u>N.J. Div. of Youth & Family Servs. v. F.M.</u>,
> 211 <u>N.J.</u> 420, 453 (2012) (quoting <u>N.J. Div.
> of Youth & Family Servs. v. M.M.</u>, 189 N.J.
> 261, 281 (2007)).]

Nor do I oppose ordering a psychological evaluation during an FN or FG proceeding when there has been <u>some</u> showing that a parent has manifested <u>any</u> psychological disorder. But as this case clearly demonstrates, the perfunctory ordering of needless psychological evaluations where there has been no such showing serves only to delay the reunification or termination proceeding without any perceptible benefit.[4]

When a child is removed, our statutory scheme recognizes that time is of the essence and reunification efforts must proceed with dispatch to avoid further trauma to the child. Much like the irrelevant services ordered in <u>I.S.</u>, <u>supra</u>, 202 <u>N.J.</u> at 178, this unnecessary psychological evaluation needlessly delayed and ultimately prevented Eric's reunification with no discernible benefit.

The Division appears to have no guidelines to inform when a psychological evaluation should be ordered, and our judges appear to routinely grant these requests without considering their necessity or the delay they inevitably cause to the reunification

---

[4] The Division should be able to recommend routine services such as parenting classes, without the questionable benefit of insight gained from these evaluations.

A-4577-15T2

process, as well as the hardship they may impose on parties who may lack transportation or have to take time off from work. When a service is recommended by the Division, our judges have the responsibility to carefully scrutinize its necessity and not blindly and indiscriminately include the service in a court order.

In finding that the Division had established the first prong of the best interests test, the trial judge appeared to blame Eric for "letting his child remain in foster care without getting involved, not contacting the Division, not being involved in any way, shape or form, [which] is withholding love, nurture and solicitude. A recognizable and cognizable harm in New Jersey."

Although Eric provided a cell phone number to a caseworker that was apparently later disconnected, the judge found that "he gave the Division incorrect information." This conclusion finds no support in the record. Even though the Division had searched for Eric unsuccessfully, when a caseworker spoke with him on June 18, 2014, she inexplicably failed to obtain his current address and never served him with the Title 9 complaint. Caseworker Moulton testified at trial:

> Q: Eventually, the Division did make contact with [Eric]?
>
> A: Yes.
>
> Q: They saw him at [Ali]'s house on June 18th, 2014?

A:    Yes.  Yes, 2014.

Q:    Okay.  And the Division got contact information from him?

A:    Yes.

Q:    A telephone number?

A:    Telephone number.

Q:    That was later disconnected - -

A:    Yes.

Q:    - - when they tried to reach it?

A:    Yes.

Q:    But did they get an address from him at that time?

A:    Not to my knowledge.

N.J.S.A. 9:6-8.41 provides:

> No hearing may commence under this act unless the court enters a finding:
>
> > a.    That the parent or guardian is present at the hearing or has been served with a copy of the complaint; or
>
> > b.    If the parent or guardian is not present, that every reasonable effort has been made to effect service under sections 18 and 19 hereof.

It was never incumbent on Eric to come forward as the FG judge and the majority suggest; it was the Division's obligation to serve him with the complaint and advise him of his right to

15

counsel. The Division failed in this regard and the trial judge failed to ensure that Eric was "keenly aware" of these proceedings and of his right to counsel. N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 632 (App. Div. 2010).

When the Division removed Adam from Ali's custody, it had an obligation mandated by our constitution to make every effort to place the child with his biological father who had previously demonstrated that he was a fit parent. See J.C., supra, 129 N.J. at 7-8 ("The law clearly favors keeping children with their natural parents and resolving care and custody problems within the family."). From the record before us, they made no effort to do so, even though an address Eric described as his permanent residence was in the Division file. When Eric learned the Division was moving to terminate his parental rights he appeared at the next court hearing and expressed a desire to parent his son. The Division then requested, and the judge imposed the needless impediments of a psychological evaluation and supervised visitation, which frustrated Eric's ability to reunite with his son.

Because I am unable to agree that Eric, who caused no harm to his son, should suffer the termination of his parental rights, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4577-15T2