# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2488-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.F.,

     Defendant,

and

K.S.H.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.H.,
a minor.

_____

     Argued February 28, 2022 – Decided March 17, 2022

     Before Judges Fasciale and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0120-21.

Ruth Harrigan, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ruth Harrigan, on the briefs).

Salima E. Burke, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

Following a Title 30 guardianship trial, the Family Part judge terminated the parental rights of K.S.H. (Kevin)[1] and K.F. (Karen) to their then two-year-old son D.H. (Dennis). Kevin appeals, whereas the Division of Child Protection and Permanency (Division) and the Law Guardian urge that we uphold the April 16, 2021 order entered by Judge Francine I. Axelrad.[2] Because we reject Kevin's

---

[1] We use pseudonyms or initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(12).

[2] Karen did not participate in any aspect of the litigation and has not filed an appeal.

contentions that the Division failed to meet its statutory burden under the four-prong best interests of the child test by clear and convincing evidence, we affirm.

I.

Kevin has been hearing impaired since he was six months old. He is proficient in sign language and reading lips. In 2007, the Division first became acquainted with Kevin in response to a referral relating to the oldest of his six other children and had periodic contact with him thereafter due to referrals involving his other children. In May 2019, the Division received a referral from Virtual Hospital alleging Dennis was born with "neonatal abstinence syndrome" and his "meconium tested positive for opiates and methadone." Karen admitted to heroin use during her pregnancy, which Kevin admitted he was aware of but described as "not that bad" and "going down." Kevin also admitted to weekly heroin use but claimed he was enrolled in an outpatient substance abuse program and had been drug-free for seven weeks.

Due to continued concern over Karen and Kevin's drug use and being unable to implement a safety protection plan to supervise the parents' interactions with Dennis, a Dodd removal[3] was conducted on June 7, 2019 when

_____

[3] A Dodd removal refers to an emergency removal of a child or children from a home without a court order, under the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82.

the child was discharged from the hospital. Dennis was placed under the care of the Division and placed in the home of resource parents because the Division could not locate a relative willing to supervise.

After almost a year of periodic status reviews, parental visitation in-person and virtual with Dennis due to the COVID-19 pandemic, drug screenings, and psychological evaluations, on August 26, 2020, the judge accepted the Division's permanency plan to terminate Karen and Kevin's parental rights followed by adoption. In rendering her decision, the judge noted Kevin completed outpatient substance abuse rehabilitation but was non-compliant with the Division's random screens and that he tested positive for fentanyl. Kevin's visitation with Dennis was sporadic, and the judge raised concerns about information Kevin provided to a psychologist.

Prior to the guardianship trial, Kevin participated in a compliance hearing and a case management conference. During the in-person guardianship trial held on April 13 and 15, 2021, the judge arranged for two proceeding interpreters and a certified deaf interpreter specialist, who noted on the record:

> [T]he certified deaf interpreter will remain very close to defense attorney . . . and . . . have clear visual access to [Kevin] so that anytime he has a question or wants to give information to his attorney he can use sign language, give that to the certified deaf interpreter who can then type it into a tablet and give that information

4

directly to [defense counsel] <u>without interrupting the proceedings</u> and the [c]ourt.

[(Emphasis added).]

Kevin did not appear on the first day of trial and failed to notify the judge or the Division caseworker as to his non-appearance. Rasheedah Brown, the caseworker assigned to the case since September 2020, testified she routinely texted Kevin regarding his scheduled SODAT[4] drug screen appointments; communicated with him generally by text; and that he never requested accommodations beyond those provided. In addition, Brown testified Kevin's missed drug screens left the Division without information as to whether he was stable enough to be reunited with Dennis. Brown also stated that Dennis was "thriving" with his resource parents, who have cared for him since he was released from the hospital.

On the second day of trial, Kevin contacted his counsel and advised "he was too sick to attend" court. The Division presented Alan J. Lee, Psy.D., as its psychological and bonding evaluation expert. Dr. Lee testified Dennis had "a significant and positive psychological attachment and bond" to his resource parents and would be at significant risk of severe and enduring harm if his

---

[4] SODAT stands for "Services to Overcome Abuse Among Teenagers, Inc."

relationship with them ended. The resource parents expressed their interest in adopting Dennis to Dr. Lee. Because Kevin missed the second evaluation session, Dr. Lee testified he was unable to make psychological findings about Kevin; opine as to bonding between Kevin and Dennis; or state whether Kevin could mitigate the risks of separating Dennis from his resource parents. Brown was recalled to testify regarding the resource parents' interests in adopting Dennis. Kevin did not present an expert witness and the Law Guardian did not present any evidence.

Defense counsel then engaged Kevin in voir dire as to whether or not he wanted to testify. Ultimately, Kevin chose to communicate with the judge and interpreters via Zoom. Over Zoom, Kevin indicated, on the record, he did not wish to testify but still wanted to visit Dennis and have contact with him. The judge found Kevin knowingly and voluntarily waived his right to testify.

During defense counsel's summation, Kevin began "interrupting." In response, the judge instructed the interpreters not to interpret Kevin's comments because

> he had the opportunity to testify. He chose not to. And there will be no interruptions. We have been through this at the case management conferences.
>
> I have advised the interpreters that although [Kevin] may be signing and they may feel it's their duty

A-2488-20

to tell the [c]ourt what he is signing, that I am absolving them of that duty . . . because this is not a colloquy.

Later during summations, Kevin signed his phone was "about to die." In response, the judge instructed Kevin to plug his phone in because the parties were "going to continue with concluding [the] trial."

At the conclusion of summations, the interpreters memorialized on the record Kevin had signed throughout counsels' summations, but the interpreters had not interpreted his comments per the judge's direction. The judge noted same and explained on the record:

> [I]f this were a situation where someone was not hearing impaired and they were in the courtroom and they were interrupting – or on Zoom and they were interrupting the arguments made by counsel, the [c]ourt would give the admonition that they are not permitted to interrupt.
>
> We have this occur in many of these cases. I understand they're emotional. And . . . in some cases we actually have to mute people with the Zoom button to stop the litigants from interrupting while the attorneys are arguing because they don't like what the attorneys are arguing.
>
> If we're in the courtroom I have unfortunately over the years that I've done this had to have sheriff's officers remove the litigants when they become vocal or abusive otherwise.
>
> So I am not treating him any differently.

On April 16, 2021, Judge Axelrad rendered a comprehensive oral decision remotely. The judge held the Division had "met its burden of proving each of the [four prongs] of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence." In reviewing the first and second prongs, "[t]he child's safety, health or development" and the parent's ability "to eliminate the harm facing the child" respectfully, the judge noted Kevin's: (1) numerous positive tests for fentanyl; (2) continuous denial of fentanyl use; (3) multiple positive test results for marijuana;[5] (4) numerous missed drug screens; (5) knowledge regarding Karen's prenatal heroin use; (6) missed psychological evaluations; (7) numerous missed visits; and (8) inability to provide a plan for Dennis. Consequently, the judge found Kevin "either unwilling, or unable, to place the best interest[s] of this child first."

Additionally, the judge emphasized a delay in permanent placement would add to the harm to Dennis. The judge specifically found the testimony of both Dr. Lee and Brown to be "credible." And, the judge noted, crediting Dr. Lee's and Brown's testimony, "Dennis was thriving in his resource parents' care and

---

[5] The judge recognized New Jersey decriminalized marijuana in November 2020 but noted Kevin's consistent use of marijuana was "not impacted by the recent legislation." "[T]he concern is, or one of the concerns in this case, is that he's an addict in treatment to the extent that he's been counseled essentially that any substance is dangerous."

they were meeting all his needs." Dennis had a "significant and positive attachment" with the resource parents and severing that relationship would put him at risk for psychological harm. "[P]ermanency was critical for [Dennis] to continue to meet his milestones."

In reviewing the third prong, the Division's reasonable efforts to help and the court's consideration of termination alternatives, the judge noted "the Division [had] made more than reasonable efforts and accommodations to [Kevin] of services," including: (1) supervised visits; (2) substance abuse evaluations; (3) SODAT screenings; (4) psychological evaluations; (5) bonding evaluations; (6) cognitive behavioral therapy; and (7) adjustments to the visitation schedule to accommodate Kevin's schedule. Additionally, Judge Axelrad noted she and the Division had made additional accommodations with regard to Kevin's hearing impairment by providing: (1) interpreters for proceedings, evaluations, and therapy; and (2) text message notifications and reminders of appointments. The judge noted Kevin had not requested any additional accommodations.

In considering alternatives to termination, the judge found "the Division had engaged multiple times with each of the potential caregivers proposed" by Kevin and Karen, including Dennis's grandmother, grandfather, and aunts, every

9

one of whom declined. In response to Kevin's proposal of a kinship legal guardian (KLG) with the resource parents, the judge noted "the record clearly showed the resource parents had been informed about the differences between adoption and KLG, and wished to adopt."

In reviewing the fourth prong, whether the "[t]ermination of parental rights will not do more harm than good," the judge explained the test of harm is not whether "no harm will befall the child," but rather whether, after "balancing the two relationships, the child will suffer a greater harm from the termination of ties with his natural parents than from . . . the permanent disruption of his relationship with his foster parents." (Quoting In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999)).

The judge elaborated "the record clearly demonstrates that [Dennis] will not suffer a greater harm from the termination of ties with [Kevin and Karen] than from the permanent disruption of his relationship with his [resource] parents." The resource parents "are essentially the only parents [Dennis] knows, the only stable home he knows, the only secure home he knows, the only two people who meet all of his needs" and are "there for him all of the time." Therefore, the judge held Dennis "was entitled to the permanency and stability that adoption by them would provide."

10

Following the trial and decision, Judge Axelrad entered an order terminating parental rights. This appeal followed. On appeal, Kevin argues:

POINT I

THE TRIAL JUDGE ERRED IN HER CONCLUSION THAT [THE DIVISION] SATISFIED THE REASONABLE EFFORTS STANDARD IN THE BEST INTERESTS TEST BECAUSE IT FAILED TO PROVIDE SERVICES THAT WERE REASONABLE UNDER ALL THE CIRCUMSTANCES AND THE COURT DID NOT EXPLORE ALTERNATIVES TO TERMINATION.

A. The Trial Judge Erred In Her Conclusion That [The Division] Presented Clear And Convincing Evidence That It Made Reasonable Efforts Toward Reunification And Satisfied The Third Prong Of The Best Interest Test.

B. The Trial Judge Erred In Her Conclusion That [The Division] Satisfied The Third Prong Of The Best Interest Test Because It Provided Services That Were Not Appropriate Under The Circumstances And That Violated The Provisions Of The Americans With Disabilities Act (42 U.S.C. § 12101 to § 12213).

C. The Trial Judge Failed To Consider Alternatives To Termination, Warranting Reversal.

POINT II

REVERSAL IS WARRANTED BECAUSE THE EVIDENCE PRESENTED DID NOT SUPPORT THE LOWER COURT'S CONCLUSION THAT DENNIS'[S] SAFETY, HEALTH, OR DEVELOPMENT WAS OR WILL CONTINUE TO BE

11

ENDANGERED BY THE PARENTAL RELATIONSHIP.

POINT III

THE COURT'S CONCLUSIONS THAT KEVIN WAS UNABLE OR UNWILLING TO ELIMINATE THE HARM FACING HIS CHILD AND UNWILLING OR UNABLE TO PROVIDE A SAFE AND STABLE HOME ENVIRONMENT WERE ERRONEOUS.

POINT IV

REVERSAL IS WARRANTED BECAUSE THE EVIDENCE PRESENTED DID NOT SUPPORT THE LOWER COURT'S CONCLUSION THAT TERMINATION OF PARENTAL RIGHTS WOULD NOT DO MORE HARM THAN GOOD.

POINT V

KEVIN WAS DENIED DUE PROCESS DURING THE PROCEEDINGS DUE TO COMMUNICATION BARRIERS RESULTING FROM THE VIOLATION OF COURT RULES GOVERNING THE RIGHTS OF HEARING[-]IMPAIRED LITIGANTS AND PANDEMIC DIRECTIVES.

POINT VI

TRIAL COUNSEL'S FAILURE TO ADVOCATE FOR HIS DEAF CLIENT AND OBJECT TO THE COURT'S VIOLATION OF COURT RULES AND DIRECTIVES REGARDING THE USE OF INTERPRETERS DURING THE PANDEMIC AND THE ADMISSION OF P-29 [KLG/ADOPTION FACT SHEET] CONSTITUTED INEFFECTIVE

ASSISTANCE OF COUNSEL AND WARRANTS REVERSAL.

## II.

In reviewing a decision by a trial court to terminate parental rights, we give deference to family courts' fact-finding because of "the family courts' special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). The judge's findings of fact are not disturbed unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).

Judge Axelrad carefully reviewed the evidence presented, concluding the Division met, by clear and convincing evidence, all the legal requirements to sustain a judgment of guardianship. Her oral decision tracks the four prongs of the best interests of the child test, N.J.S.A. 30:4C-15.1(a); accords with our prior holdings in K.H.O.; In re Guardianship of D.M.H., 161 N.J. 365 (1999); and N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420 (2012); and is supported by substantial and credible evidence in the record. We, therefore, affirm

substantially on the grounds expressed in the judge's comprehensive and well-reasoned decision. We highlight the following analysis of each best interest prong.

A. Prongs One and Two

As to prong one, the Division must prove "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). "[T]he relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 289 (2007).

"Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)). As a result, "courts must consider the potential psychological damage that may result from reunification[,] as the 'potential return of a child to a parent may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 605 (1986)).

"The absence of physical abuse or neglect is not conclusive." A.W., 103 N.J. at 605 (quoting In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977)). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383.

As to prong two, which addresses considerations under prong one, the Division must prove "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The harm may include evidence that separating the children from their resource parents "would cause serious and enduring emotional or psychological harm." M.M., 189 N.J. at 280 (quoting N.J.S.A. 30:4C-15.1(a)(2)).[6]

---

[6] We are aware that on July 2, 2021, the Legislature enacted L. 2021 c. 154 § 9 amending N.J.S.A. 30:4C-15.1(a) pertaining to the standards for terminating parental rights. Specifically, the Legislature amended N.J.S.A. 30:4C-15.1(a)(2), to exclude from consideration in a termination of parental rights case the harm to a child caused from being removed from resource parents.

The Division can establish the second prong by proving that a "child will suffer substantially from a lack of stability and a permanent placement[,] and from the disruption of [a] bond with" the resource parents. K.H.O., 161 N.J. at 363. Because they are related, evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

Kevin argues the judge's legal conclusion that the Division satisfied the first prong was erroneous because the judge's decision was not based on a finding of abuse or neglect but rather presumptions relative to his "denial of his own substance abuse, noncomplian[ce] with services, and [inability] to address [Dennis]'s needs consistently." We disagree because Kevin's arguments are not an accurate reflection of the record.

The first prong is clearly and convincingly satisfied where a child is "born drug-addicted," which requires hospitalization. K.H.O., 161 N.J. at 351-52; see also F.M., 211 N.J. at 449 ("A parent has the obligation to protect a child from harms that can be inflicted by another parent."). Such harm, which "threatens the child's health and will likely have continuing deleterious effects on the child," is reinforced by the second prong, i.e., a parent's inability to take responsibility. K.H.O., 161 N.J. at 352. "[P]arental dereliction and

16

irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit," are indicative of "neglect and lack of nurture for the child." Id. at 353.

A parent's failure "to attend evaluations and visits with" his or her child may be evidence of harm. N.J. Div. of Child Prot. & Permanency v. A.S.K., 457 N.J. Super. 304, 327 (App. Div. 2017). The Court has stressed that harm includes the denial of "the attention and concern of a caring family[,]" which it considers "the most precious of all resources." D.M.H., 161 N.J. at 379 (quoting A.W., 103 N.J. at 613). "A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of a child." Id. at 379. Such a withdrawal is not "inadequate parenting;" rather, it is a "failure to provide even minimal parenting." Ibid. (citing A.W. 103 N.J. at 606-07). A parent's failure to provide a "permanent, safe, and stable home" engenders significant harm to the children. Id. at 383. As such, a parent's failure to comply with a Family Part's specific requirements to reunite with his or her child reveals "the very low priority" the parent has "to

building or even merely staving off the termination of his [or her] parental relationship with [the child]." A.S.K., 457 N.J. Super. at 327.

Here, there was substantial and credible evidence that Kevin's parental relationship with Dennis was detrimental to the child's safety, health, and development. Dennis was born drug-addicted, and "suffered withdrawal." Because Kevin was aware of Karen's use throughout her pregnancy, he had an obligation to protect Dennis from her abuse but did not. F.M., 211 N.J. at 449.

Also, Kevin's inability to take responsibility for the harm he caused Dennis reinforces the judge's finding of a continuous risk of harm caused by both parent's drug usage and supports the court's finding of Kevin's inability to eliminate the harm. See K.H.O., 161 N.J. at 352-53. As highlighted by the judge, for approximately two years after Dennis's hospitalization, Kevin continued to test positive for fentanyl and marijuana, and he continued to deny his fentanyl use even in the face of positive test results.

> [Kevin] did not admit to any substance abuse concerns. He claimed the positive fentanyl screens were a mistake. And this is June of 2020. He had . . . he had a positive fentanyl in August of 2020, two months after. He denied he needed drug treatment or that the Division even recommended it. He blamed others. . . . He denied—he blames others for his problems and difficulties, does not take responsibility of concern that much of the information provided to the evaluator was contrary to the documented information.

18

Finally, Kevin's failure "to attend evaluations and visits with" Dennis may be considered evidence of risk of continuous harm and Kevin's unwillingness to eliminate said harm.  A.S.K., 457 N.J. Super. at 327.  Despite the judge's clear, specific, and consistent orders, Kevin continuously missed his screens, visits, and psychological evaluations.  On June 1, 2020, upon granting the Division's request to extend the goal of reunification by three months, the judge again provided Kevin with specific requirements if he wanted to be reunited with Dennis, namely:  (1) completing a psychological evaluation; (2) attending visits consistently; (3) develop a childcare plan; (4) remain compliant with drug treatment; and (5) attend random urine screens.

Between June 1 and August 26, 2020, however, Kevin tested positive, missed his scheduled drug screening, and missed or cancelled one-half of his visits.  Accordingly, there was clear and convincing evidence to support the judge's finding the Division satisfied prongs one and two by clear and convincing evidence and that a continued parental relationship with Kevin would harm Dennis.

B.  Prong Three

As to prong three, the Division is required to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the

child's placement outside the home[,] and the court [will] consider[] alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). This prong "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354.

Within the meaning of prong three, "reasonable efforts" include, but are not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

"Whether particular services are necessary in order to comply with the [reasonable] efforts requirement must . . . be decided with reference to the circumstances of the individual case before the court." D.M.H., 161 N.J. at 390.

The Division

must encourage, foster and maintain the bond between the parent and child as a basis for the reunification of the family. [It] must promote and assist in visitation and keep the parent informed of the child's progress in foster care. [It] should also inform the parent of the necessary or appropriate measures he or she should pursue in order to continue and strengthen that relationship and, eventually, to become an effective caretaker and regain custody of his or her children.

[Ibid. (citing, in part, N.J.S.A. 30:4C-15.1(c)).]

A court is required to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). "[A]ssessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 583 (App. Div. 2011).

N.J.S.A. 30:4C-12.1(a) requires the Division to initiate a search within thirty days of accepting a child into its care or custody for relatives who may be willing and able to provide the care and support required for the child. The Division must assess each interested relative and, if it determines that the relative is unable or unwilling to care for the child, inform the relative of its reasons for a denial of placement. N.J.S.A. 30:4C-12.1(a) to (b). Also, in July 2021, L. 2021, c. 154, § 4 amended the laws pertaining to the KLG Act, N.J.S.A.

3B:12A-1 to -7, by deleting "and (b) adoption of the child is neither feasible nor likely" under N.J.S.A. 3B:12A-6(d)(3).

"It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Fam. Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002). "[T]he Division's statutory obligation does not permit willful blindness and inexplicable delay in assessing and approving or disapproving a relative known to the Division . . . ." K.L.W., 419 N.J. Super. at 582. It cannot ignore relatives "based upon an arbitrary, preordained preference for the foster placement" and "must perform a reasonable investigation of . . . relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013).

Kevin contends the judge erred in finding the Division had made reasonable efforts toward reunification because the Division provided services that violated Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213, and the judge failed to consider alternatives to termination.

Under the ADA and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, reasonable efforts require the Division to ensure a parent with a

disability is not excluded from participating in or denied the benefits of the agency's services, programs, or activities because of his or her disability. 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130(b)(1). "This principle can require the provision of aids, benefits, and services different from those provided to other parents . . . where necessary to ensure an equal opportunity to obtain the same result or gain the same benefit, such as family reunification." U.S. Dep't of Health & Hum. Servs. & U.S. Dep't of Just., Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, (Technical Assistance) 1, 4-5 (Aug. 2015), https://www.hhs.gov/sites/default/files/disability.pdf.

The provision of aids, benefits, and services required to effectively communicate with a deaf individual "will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). Depending on the communication, a handwritten note or text may suffice. See Technical Assistance at 11. An agency must "give primary consideration to the choice of aid or service requested by the person who has a communication disability." U.S. Dep't of

A-2488-20

Just., ADA Requirements: Effective Communication, 1, 6 (Jan. 2014), https://www.ada.gov/effective-comm.pdf.

A violation of the ADA, however, "does not provide a defense to a termination of parental rights proceeding." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 442 (App. Div. 2001). A parent's ADA status and respective "limitations are indirectly addressed by the Division's efforts to provide services to help the parents correct the circumstances which led to [the Division's involvement] and consider the alternatives to termination of [his] or her parental rights." Ibid. The Division must consider the parent's disability in its reasonable efforts just as it would any other unique circumstance of a case. See D.M.H., 161 N.J. at 390-91.

In essence Kevin argues, the Division: (1) "failed to refer [him] for an initialized assessment of his disability"; (2) failed to make reasonable accommodations for his hearing impairment; and (3) "failed to explore sibling visits for Dennis."[7]

---

[7] Kevin also argues the Division "placed Dennis with hearing resource parents so he did not learn to communicate via sign language." Kevin provides no case law or statute to support his argument that the Division is required to place children of parents with disabilities with resource parents with similar disabilities.

With respect to Kevin's first argument, the ADA has a "basic requirement that the need of a disabled person be evaluated on an individual basis."  PGA Tour, Inc. v. Martin, 532 U.S. 661, 690 (2001).  In New Jersey Division of Child Protection and Permanency v. T.D., we held the Division failed to meet its obligation of reasonable efforts because the Division did not initially assess the extent of the parent's disability—multiple sclerosis (M.S.)—and take that into account when providing services.  454 N.J. Super. 353, 365 (App. Div. 2018).  We stated the Division should have obtained the parent's medical records "as to potential side effects and limitations of functions as it pertains to [the parent's] parenting."  Ibid.

In the matter under review however, an initial assessment was not required because it is undisputed Kevin has a full hearing impairment, and it was unnecessary for the Division to perform because the limitations of full hearing impairment do not vary.  More importantly, unlike in T.D., where the parent's M.S. was assumed to impair her ability to parent, Kevin's hearing impairment "was not assumed to impair [his] parenting."

Kevin also argues the Division did not make reasonable efforts to accommodate his hearing impairment.  The provision of aids, benefits, and services required to effectively communicate with a deaf individual, however,

"will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). In other words, the method of communication does not matter so long as the method will reasonably and effectively communicate with the deaf individual.

Here, Brown testified she typically communicated with Kevin via text messaging and through Karen. See also Technical Assistance at 12 (permitting the Division to "rely on adults accompanying individuals with disabilities to interpret"). The text messages included routine reminders of Kevin's upcoming visits, SODAT screenings, and evaluations. The record shows Kevin frequently responded to Brown's text messages, and he never requested an accommodation other than what was provided by the Division. We are convinced the Division made reasonable efforts to ensure Kevin was not excluded from participating in or denied the benefits of its services, programs, or activities because of his disability. We also conclude the judge scrupulously followed the protocols for sign language interpreters and exercised "reasonable control over the mode and order of interrogating witnesses and presenting evidence" under Rule 611(a).

Kevin also asserts the Division "failed to explore sibling visits for Dennis." N.J.S.A. 9:6B-4(f) provides "[a] child placed outside his [or her] home shall have the" right "to visit with the child's sibling[s] on a regular basis and to otherwise maintain contact with the child's sibling if the child was separated from his [or her] sibling upon placement outside his home." (Emphases added). Here, the Division did not separate Dennis from his siblings. Kevin has a final restraining order barring him from having contact with his oldest three children and his other three children who live out-of-state. Moreover, Dennis and his siblings are not part of the same household and, consequently, were not separated upon Dennis's placement with his non-relative resource parents.

As correctly noted by the judge, "none of these siblings are in the custody of the Division, meaning the Division would not have control over sibling visits." "[T]here was never any discussion with regard to [sibling visits]. And again[,] had it been raised it would have been problematic because these siblings are not within the control of the Division. But that's never been an issue, therefore I am disposing of that issue right up front." Therefore, the Division was not required to explore sibling visits for Dennis.

Finally, under prong three, Kevin argues the judge failed to consider alternatives to termination. Specifically, Kevin argues the judge: (1) did not

27

evaluate whether the Division fully explored relative placements for KLG or KLG with the resource parents; and (2) did not consider recent statutory changes that make "kinship care the preferred resource."[8]

Under prong three, an alternative to termination of parental rights is KLG. KLG allows a relative to become the child's legal guardian and commit to care for the child until adulthood, without stripping parental rights. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 508 (2004). The Legislature created this arrangement because it found "that an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

Prior to July 2, 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at 512-13 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). "[W]hen a caregiver . . . unequivocally assert[ed] a desire to adopt," the standard to impose

---

[8] Kevin also argues the record was insufficient to support the Family Part's finding that the resource parents were interested in adopting Dennis because "[t]he only evidence at trial . . . came from second-hand representations from . . . Brown and Dr. Lee." Kevin makes a substantially similar argument under the fourth prong, claiming the resource "parents did not testify at the guardianship trial that they were committed to adopting Dennis."

a KLG was not satisfied because the party seeking a KLG arrangement would not be able to show that adoption was neither feasible nor likely. N.J. Div. of Youth & Fam. Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011). In other words, when permanency through adoption was available to a child, KLG could not be used as a defense to the termination of parental rights. N.J. Div. of Youth & Fam. Servs. v. D.H., 398 N.J. Super. 333, 341 (App. Div. 2008).

On July 2, 2021, however, the Legislature enacted L. 2021, c. 154, which, in part, removed the KLG requirement that adoption be "neither feasible nor likely." P.P., 180 N.J. at 512-13 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). This means KLG may now remain a valid defense to the termination of parental rights. D.H., 398 N.J. Super. at 341. Here, Kevin argues "[r]etroactive application of this legislative change is warranted by the legislative intent expressed in the plain language of the statute, given that L. 2021, c. 154 was specifically written to take effect immediately." In response, the Division argues: (1) "this case was decided in April—before the amendments' July 2 enactment and effective date"; and (2) the amendments are not applicable here because there was no KLG alternative available.

Regardless of whether the amendment applies retroactively, a KLG defense requires a valid KLG alternative. See D.H., 398 N.J. Super. at 341.

Despite Kevin's contentions to the contrary, the judge evaluated whether the Division fully explored relative placements for KLG. Based on Kevin and Karen's recommendations, the Division initially considered Dennis's grandmother, grandfather, and aunts, but none were able or willing to supervise Dennis.

The Division, however, was not obliged to identify and locate relatives unidentified by the parents. K.L.W., 419 N.J. Super. at 582. "[A] parent can[not] expect the Division to locate a relative with no information or . . . wait until the eve of the guardianship trial to identify a relative who is willing to adopt." Ibid. As such, the Division was not required to consider Dennis's siblings prior to terminating Kevin's parental rights because prior to trial, the record demonstrates Kevin never recommended Dennis's siblings as relative placements. Thus, the Division met the third prong by clear and convincing evidence.

C. Prong Four

Under prong four, the Division must demonstrate by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The prong characterizes "[a] child's need for permanency [a]s an important consideration." M.M., 189 N.J. at 281. "The

question to be addressed under th[is] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." K.H.O., 161 N.J. at 355. In order to weigh any potential harm from terminating parental rights against a child's separation from his or her foster parents, a court must consider expert testimony on the strength of each relationship. J.C., 129 N.J. at 25. "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy . . . N.J.S.A. 30:4C-15.1(a)(4)." K.H.O., 161 N.J. at 363.

Kevin challenges the judge's prong four findings arguing termination of his parental rights will do more harm than good. He contends the Division failed to provide a bonding evaluation from Dr. Lee, or any other expert, as to his bond with Dennis. Additionally, Kevin claims the bonding report could not be completed due to the Division's "failure to accommodate [his] need for numerous translators and the extra time that takes."

The judge considered Dr. Lee's testimony that he has conducted evaluations before with professional interpreters and he customarily allots almost twice as much time for an evaluation utilizing an interpreter. Dr. Lee

31

testified two professional interpreters were provided by the Division for Kevin's appointment, but he arrived over thirty minutes late. In addition, Dr. Lee explained that Kevin "frequently discussed and interjected many topics" tangential to the evaluation. Another appointment was scheduled by Dr. Lee with Kevin to finish the evaluation at his convenience, but he did not attend.

We have held where a parent's bonding evaluation is not available because of the parent's failure to attend an evaluation, the court may review the uncontradicted testimony of the Division's expert regarding the expert's bonding evaluation of the child and the resource parents. A.S.K., 457 N.J. Super. at 329-30. The record supports that finding under prong four.

## III.

Next, Kevin argues the resource "parents did not testify at the guardianship trial that they were committed to adopting Dennis." It is not unusual for neither resource parent to testify in guardianship litigation. N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 266 (App. Div. 2019). Therefore, evidence of "the communications by and with [the resource parents] concerning adoption and KLG are all hearsay statements." Ibid.

A belated objection to a resource parent's hearsay statements "is barred by the invited error doctrine." N.J. Div. of Child Prot. & Permanency v. J.D., 447

32

N.J. Super. 337, 348 (App. Div. 2016).  The invited error doctrine "operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error."  N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)).  The belated objection would otherwise deprive the litigant's adversary the opportunity to: (1) overcome the objection; (2) take steps to satisfy the evidentiary requirements needed to admit the evidence; or (3) present alternative evidence.  Id. at 341.  We will not reverse the evidence's admission unless the appellant establishes the admission constituted plain error.  J.D., 447 N.J. Super. at 349-50 (citing R. 2:10-2).

"[H]earsay[,] subject to a well-founded objection[,] is generally evidential if no objection is made."  Id. at 348-49.  We have recognized:

> [A] party is free to waive objection to the admission of hearsay evidence.  In some cases, parties may have no reason to question the accuracy of such hearsay, or may make "a strategic decision to try the case based on the documents, instead of possibly facing a witness's direct testimony."
>
> [Id. at 349 (alteration in original) (quoting N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 503 (App. Div. 2016)).]

A party who fails to object to the admittance of evidence, effectively consents to its admission.  M.C. III, 201 N.J. at 341-42, 350 (affirming the Family Part's

33

consideration of embedded hearsay in evidence admitted without objection by defense counsel).  As such, we presume the Family Part "appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence." J.D., 447 N.J. Super. at 349.

Here, Kevin failed to object to the testimony of Brown or Dr. Lee, both confirming the resource parents' interest in adopting Dennis.  Kevin therefore consented to the admittance of the testimonial evidence, including the resource parents' hearsay statements.  M.C. III, 201 N.J. at 341.  As a result, Kevin is barred from arguing on appeal that the admission of the testimony of Brown and Dr. Lee constituted error.  Id. at 340-41.

Kevin also argues the judge deprived him of his due process protections. Both the United States and New Jersey constitutions provide "a 'fundamental guarantee of due process,'" which is "implicated 'whenever an individual risks governmental exposure to a "grievous loss."'" S.C. v. N.J. Dep't of Child. & Fams., 242 N.J. 201, 230 (2020) (first quoting Jamgochian v. State Parole Bd., 196 N.J. 222, 239 (2008); and then quoting State in Interest of D.G.W., 70 N.J. 488, 501 (1976)).

Our Court has "repeatedly affirmed that parental rights are fundamental and constitutionally protected." N.J. Div. of Youth & Fam. Servs. v. A.R.G,

179 N.J. 264, 285–86 (2004) (citing Moriarty v. Bradt, 177 N.J. 84, 109 (2003)). Termination of parental rights implicates due process protections. Due process protections require, at a minimum, adequate notice and a meaningful opportunity to be heard. Id. at 286. Although parental rights' protections "are tempered by the State's parens patriae responsibility to protect the welfare of children. . . . The court's authority to remove children from the custody of their parents must be exercised with scrupulous adherence to procedural safeguards." Ibid. (citations omitted).

> To determine whether a parent was afforded procedural due process in a termination proceeding, . . . . the court must balance three factors: (1) the private interest that will be affected by the official action; (2) the risk that there will be an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the governmental interest involved, including the added fiscal and administrative burdens that additional or substitute procedures would require.
>
> [N.J. Div. of Child Prot. & Permanency v. K.S., 445 N.J. Super. 384, 390-91 (App. Div. 2016) (internal quotation marks omitted).]

We have recognized "a parent's private interest in maintaining some relationship with his or her children is 'far more precious than any property right.'" Id. at 391 (quoting In re Adoption of J.E.V., 442 N.J. Super. 472, 481

(App. Div. 2015)). However, "[c]hildren are entitled to permanency, which at times may restrict a parent's [constitutional] right." Ibid.

Kevin argues the judge denied him both notice and a meaningful opportunity to be heard by failing "to abide by pandemic-related directives" and provide "adequate language supports for interpretation." Specifically, Kevin argues: (1) he "was denied in-person hearings for his case management proceedings," pursuant to Administrative Directive #12-20;[9] and (2) the first day of trial was not adjourned nor were virtual accommodations "provided until after testimony was concluded on the second day of trial," pursuant to Addendum to Directive #1-17.[10] Again, we disagree.

First, Kevin was not denied in-person hearings. Per Administrative Directive #12-20, trial courts were required to "proceed[] with remote video and phone options instead of in-person appearances," unless the matter required "the consent of all parties." Both "termination of parental rights trials" and "hearings

---

[9] Administrative Directive #12-20, "Principles and Protocols for Virtual Court Operations During the COVID-19 Coronavirus Pandemic" (Apr. 27, 2020); but see Administrative Directive #06-21, "COVID-19 – Protocols for Matters that Cannot Proceed in a Remote Format Without Consent" (Feb. 23, 2021).

[10] Addendum to Directive #1-17, "COVID-19 Pandemic-Affirmation and Expansion of the New Jersey Judiciary Language Access Plan for Remote Court Events" (Jun. 18, 2020).

for an . . . appointment of a permanent guardian" were listed as such exceptions. Ibid.

The record is devoid of a specific instance wherein Kevin requested an in-person hearing. See Administrative Directive #6-21 (requiring a party's objection to proceeding remotely to be memorialized on the record). Rather, the record reflects Kevin's repeated consent to conducting his hearings virtually. The judge did not fail to abide by Administrative Direction #12-20 because Kevin consented to virtual hearings instead of in-person appearances.

We are convinced Kevin was not denied meaningful participation at the in-person trial. "Procedural due process standards require the opportunity for meaningful participation by the person at risk of limitation" but does "not confer a constitutional right of confrontation or mandate a parent's presence at the trial." Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 467, 468 (App. Div. 2003). Meaningful participation entitles a parent "to every reasonable opportunity to produce evidence." K.S., 445 N.J. Super. at 394. A parent may not be deprived "of his or her right to testify [at trial] to keep his or her children." Id. at 392. Thus, a parent is "afforded due process where the parent receives notice, is represented by counsel, and is given an opportunity to testify by telephone or deposition." M.Y.J.P., 360 N.J. Super. at 468. Based

upon our careful review of the record, we are satisfied Kevin was provided a reasonable opportunity to a meaningful participation at trial.

IV.

Finally, we address Kevin's claim that his attorney was ineffective for failing to: (1) object to the admission of the KLG/Adoption Fact Sheet; (2) request an adjournment in response to Kevin's illness; and (3) object "to the blatant disregard of court rules and directives regarding the use of interpreters."

"[A] defendant has a right to [the effective assistance of] counsel when a complaint is filed against him or her charging abuse and neglect and threatening the individual's parental rights." N.J. Div. of Youth & Fam. Servs. v. B.H., 391 N.J. Super. 322, 345 (App. Div. 2007) (citing N.J.S.A. 9:6-8.43(a)). In determining whether that right has been violated, we apply the test as set forth in Strickland v. Washington, 466 U.S. 668 (1984). Id. at 346; see N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 308-09 (2007) (adopting the Strickland test in parental termination cases).

Specifically,

> (1) counsel's performance must be objectively deficient—i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense—i.e., there must be "a reasonable probability

that, but for counsel's unprofessional errors, the result
of the proceeding would have been different."

[B.R., 192 N.J. at 307 (quoting Strickland, 466 U.S. at
694).]

The Strickland standard is "highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 307-08 (quoting Strickland, 466 U.S. at 689). To establish the elements of an ineffective-assistance-of-counsel claim, "appellate counsel must provide a detailed exposition of how the trial lawyer fell short and a statement regarding why the result would have been different had the lawyer's performance not been deficient. That will include the requirement of an evidentiary proffer in appropriate cases." Id. at 311.

Applying this standard, we reject each of Kevin's ineffective assistance of counsel claims in turn. First, defense counsel's failure to object to the admission of the KLG/Adoption Fact Sheet (P-29) lacks merit because nothing in the record indicates the judge needed to consider that evidence in making her decision. Second, defense counsel invoked a trial strategy decision that

considered all possible options after learning Kevin would not be appealing on the second day of trial. Defense counsel noted on the record:

> So I have no problem with proceeding today. . . . [T]his is an expert. And generally when the expert testifies, I don't need my client to cross-examine the expert.
>
> However, he has a right to testify as we all know. He's requested if he could somehow participate by video. . . . If he's still ill tomorrow I would like him to appear via video if we could set that up, so he can have his say in this trial. If not, Your Honor, I'm going to ask for a postponement, which I would really dread doing. I believe we can accomplish our goal of having him testify if he really wants to, okay? . . . .
>
> I think that's the only way it's going to be practical because anybody, as you know, who exhibits any symptoms of anything nowadays can't come into a public building. Indeed he's told me he's cancelling his visit with the child for tomorrow because he doesn't want to get [Dennis] sick. So that's my request, Your Honor.

Nor did defense counsel continue with his closing remarks without first providing Kevin with the possible options, "I can do the closing without you appearing remotely with your permission. I need you to make a decision about that." Clearly, Kevin's assertion that his counsel was ineffective for not requesting an adjournment is belied by the record. Moreover, Kevin fails to identify how any alleged deficient conduct resulted in prejudice to him or that

the result of the proceeding would have been different.  See e.g., <u>N.J. Div. of Youth & Fam. Servs. v. N.S.</u>, 412 N.J. Super. 593, 643 (App. Div. 2010).

A review of prejudice in a termination case "begin[s] by considering the strength of the [Division]'s evidence."  <u>State v. Gideon</u>, 244 N.J. 538, 556 (2021).  Our Court has repeatedly noted a prejudice analysis requires review of the strength of the evidence presented to the fact-finder at trial.  <u>Id.</u> at 561 (quoting <u>State v. Pierre</u>, 223 N.J. 560, 583 (2015)).  A conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  <u>Id.</u> at 556-67 (quoting <u>State v. Pierre</u>, 223 N.J. 560, 583 (2015)).  Thus, defendant has failed to establish the elements required to prevail on any of his ineffective assistance of counsel claims.  Similarly, given our conclusion that the judgment was supported by the evidence and the law, Kevin would not have prevailed on any of his three theories alleging ineffective assistance of counsel.  Kevin's remaining arguments lack merit to warrant further discussion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2488-20