# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3062-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

T.K.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.I.L.,
a minor.

_____

     Argued March 4, 2025 – Decided March 20, 2025

     Before Judges Smith and Chase.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0064-23.

     Beatrix W. Shear, Designated Counsel, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Beatrix W. Shear, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

David B. Valentin, Assistant Deputy Public Defender, argued the cause for minor (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, on the brief).

PER CURIAM

Defendant, T.K. ("Tony") appeals from the judgment of guardianship terminating his parental rights to his biological child, K.I.L. ("Kara").[1] We affirm.

I.

In April 2022, L.H. ("Lynn"), gave birth to Kara. At the time, Lynn was incarcerated for the attempted murder of C.S. Lynn told the Division of Child Protection and Permanency (the "Division" or "DCPP") that she was convinced C.S. was Kara's father. She also told the Division she and Tony had dated, and Tony had drugged, human trafficked, and physically abused her. Lynn's spelling of Tony's last name had many inaccuracies including a different first letter.

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because the records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

A-3062-23

Given Lynn's incarceration, the Division asked her for the names of several relatives whom she thought may be willing to care for Kara. Upon investigation, none of these relatives were willing or able to care for Kara. One relative, who had custody of another of Lynn's children, recommended Kara be placed with close friends, N.T. ("Natalie") and her wife R.T. ("Rachel").

DCPP then filed an order to show cause ("OSC") to obtain physical and legal custody of Kara. In its OSC, DCPP identified Lynn as the mother and the father as "unknown." The OSC was granted and DCPP temporarily placed Kara with Natalie and Rachel. Kara has remained under their care since.

In January 2023, the Division was ordered to complete a paternity test for C.S. At the end of March, C.S. was ruled out as Kara's father. The day after the test results came back, Lynn identified Tony to Division caseworker Jillian Lepore as Kara's putative father.

On April 19, 2023, the Family Part held a permanency hearing at which time the court accepted the Division's plan for termination of parental rights followed by adoption. The same day, Lynn executed an identified surrender

allowing Kara to be adopted by her resource parents.[2]  At this time, Tony had not been conclusively established as Kara's father.

Tony has been incarcerated since September 2022, when Kara was six months old.  In June 2023, the Division received the paternity test results confirming that Tony was Kara's biological father.  Upon obtaining the paternity result, the Division immediately filed an amended complaint for Guardianship to include Tony.  Tony's initial appearance on the matter was held in July where he requested and was then appointed counsel.  When he received the complaint, Tony stated that he wanted to go to Mid-State Correctional Facility ("Mid-State") so he could engage in their therapy programs.[3]

In August 2023, the Division received a call from Kara's paternal great-great aunt, C.D. ("Aunt C"), who indicated that she wanted to be a caregiver for Kara.  Later that month, the Division determined that it would not be in Kara's best interest to be placed with Aunt C based on the significant length of time she had spent with Natalie and Rachel.

---

[2]  Having given up her parental rights of Kara, Lynn does not take part in this appeal.

[3]  In February 2025, after briefing was complete, Tony filed a motion to supplement the record which we granted.  The documents show that Tony completed the following programs while incarcerated:  drug rehabilitation, G.E.D., food handler and production manager, and parenting.

A-3062-23

In September 2023, Tony informed the Division that he was finally at Mid-State and could receive in-person visits. In October, the Division brought Kara to Mid-State for her first visit. Other visits occurred as well. He is due to be released on three years parole on March 28, 2025.

In December 2023, Tony engaged in a psychological evaluation with Karen D. Wells, Psy.D. Dr. Wells concluded that Tony was unable to care for Kara at that time or in the foreseeable future. Before trial, Dr. Wells conducted an updated psychological and bonding evaluation of Tony and reiterated her findings that Tony has a history of substance abuse, mental health concerns, as well as police and legal involvements.

In March 2024, a two-day guardianship trial was held. At trial, the Division presented three witnesses: Natalie, Lepore, and Dr. Wells. Tony did not testify and called no witnesses on his behalf. In the hearings leading up to trial, and at trial, Tony did not contest the Division's custody of Kara.

The first witness, Natalie, testified to her conversations with the Division caseworkers regarding the difference between Kinship Legal Guardian ("KLG") and adoption, and made clear that she unequivocally preferred adoption and opposed KLG. Natalie was found credible by the court.

5

The Division's second witness, Lepore, testified that she was assigned to the case in March 2023, and provided her independent recollection of the facts. She testified as to the timeline of the case and the extensive efforts made by the Division to assist the family in correcting the circumstances that led to Kara's removal. She also testified that she discussed the difference between KLG and adoption with Natalie and Rachel. Lastly, she testified to the Division's concerns about Tony's lengthy substance abuse history, lack of ability to maintain sobriety in the community, and ability to find stable housing and employment once released from imprisonment. The court found her testimony to be credible.

The Division's final witness was Dr. Wells, whom all parties stipulated to as an expert witness. Dr. Wells testified to her two psychological evaluations of Tony as well as a psychological bonding evaluation between Tony and Kara and between Kara and Natalie and Rachel. Dr. Wells had "'grave concerns' regarding Tony's ability to provide Kara with a safe home and family life now, or within the foreseeable future." Further, Dr. Wells testified that Kara would "'suffer deeply' if her permanency was delayed and she was expected to wait for [Tony] to remedy his issues." Dr. Wells stated that it would take at least a year after Tony was released to see if he relapsed, could hold a job, or care for Kara.

A-3062-23

The court found she "testified extensively regarding her evaluations, findings, and recommendations." The court found credible her testimony about the absence of a bond with Tony and that Kara would suffer no emotional harm if Tony's parental rights were severed.

Following trial, the court issued an order and written opinion terminating Tony's parental rights to Kara. The court recited the four prongs of the best interests of the child test as found in N.J.S.A. 30:4C-15.1(a) and determined that the Division met its burden by clear and convincing evidence. Notably, Tony did not argue to the trial court that his due process rights were violated.

This appeal follows.

## II.

Our scope of appellate review is limited. It is well established in Title 30 cases that we will not second-guess or substitute our judgment for that of the family court, provided its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "We accord deference to fact[-]findings of the family

A-3062-23

court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)); see also N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023). We owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017); see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

Turning to substantive legal principles, "[p]arents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship and adoption cases, such as here, it is

well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

Consequently, the law requires a balancing of those two competing interests. That balancing "is achieved through the best interest of the child standard." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 114 (App. Div. 2021) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999)). The Legislature codified that standard in N.J.S.A. 30:4C-15.1(a). See D.C.A., 256 N.J. at 21 (recognizing the Legislature codified "the best interests test" when it enacted N.J.S.A. 30:4C-15.1(a)). Thus, when seeking termination of parental rights, the Division must establish, by clear and convincing evidence, the following four-prong criteria set forth in N.J.S.A. 30:4C-15.1(a), as amended by the Legislature in 2021:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

These four prongs are "not discrete and separate" but rather "overlap to offer a full picture of the child's best interests." N.J. Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014).

### III.

Tony first argues that the guardianship judgment must be reversed because he was denied procedural due process. He posits that DCPP did not adequately find and notice him, inform him how to obtain counsel if indigent, nor give him the opportunity to be heard. He also contends that DCPP did not have the prerequisite care or custody of Kara to bring a Title 30 action to terminate his parental rights to her.

While "[i]t is well[-]established as a matter of due process principle that procedural requirements are more demanding in parental termination cases than in ordinary civil actions," due process "is a flexible concept and calls for such procedural protections as the particular situation demands." N.J. Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 464-67 (App. Div. 2003). In

10

A-3062-23

N.J. Div. of Child Prot. & Permanency v. A.S.K., the Division failed to locate the defendant after filing a complaint for guardianship of the defendant's son. 457 N.J. Super. 304, 313 (2019). The Division did not locate the defendant until eleven months after the filing. Ibid. The Division acknowledged that, in its search efforts for the defendant, there were some deviations from its normal procedure, but the defendant was ultimately located. A.S.K, 236 N.J. at 430. Our Supreme Court "perceive[d] no prejudice" in the delay of service "on a biological parent who is not currently in the picture for a child under the [Division's] supervision." Ibid. (internal quotation marks omitted).

Here, as in A.S.K., the Law Guardian and DCPP admit it took from April 2022 to June 2023 to establish Tony's paternity. Over the course of the first six-months, Lynn believed that C.S. was Kara's father. While DCPP could have completed the testing on C.S. and Tony more expediently, so that Tony could be determined to be Kara's father, Tony, has been incarcerated and not in a position to raise Kara since September 2023. Moreover, Tony was able to participate in the guardianship litigation, was represented by counsel, and was given the opportunity to meaningfully participate. Like in A.S.K., Tony was not prejudiced by being unable to participate in the original litigation. His due process rights were not violated.

Tony's argument that the Division did not have the prerequisite care or custody of Kara required to bring an action under N.J.S.A. 30:4C-15 is also without merit. Under N.J.S.A. 30:4C-12, the Legislature created procedures for obtaining "care or custody" of an individual. F.M., 211 N.J. at 443. The Division may apply to the Family Part "'for an order making the child a ward of the court and placing the child under the care and supervision or custody of [DCPP].'" Ibid. (quoting N.J.S.A. 30:4C-12). That is what happened here. Moreover, an award of care or custody under N.J.S.A. 30:4C-12 can act as "a stand-alone basis for filing a guardianship complaint under N.J.S.A. 30:4C-15(c)." Ibid.

In addition, a party who has had a sufficient opportunity and the right to challenge the award of care and custody of a child to DCPP in the Family Part may be barred by the doctrine of laches from asserting that the Division did not have custody on appeal. Id. at 445. "Laches is an equitable doctrine, operating as an affirmative defense that precludes relief when there is an 'unexplainable and inexcusable delay' in exercising a right, which results in prejudice to another party." Fox v. Millman, 210 N.J. 401, 417 (2012) (quoting Cnty. of Morris v. Fauver, 153 N.J. 80, 105 (1998)). "In deciding whether to apply the doctrine, courts should consider the length of delay in a party's assertion of the claim, the

reasons given for the delay, and the changing conditions of either or both parties during the delay." F.M., 211 N.J. at 445-46 (internal quotation marks omitted).

In F.M., defendant appealed the termination of her parental rights regarding her two children in part by arguing that the Division's precursor erred in filing a guardianship action under N.J.S.A. 30:4C-15(c) without first obtaining "care of custody" through proper statutory means. Id. at 439-40. The court determined that since defendant did not challenge the award of "care or custody" during the guardianship hearing, the doctrine of laches must be analyzed when deciding whether the defendant may raise the issue on appeal for the first time. Id. at 442. The court considered the fact that F.M. appeared in court a total of six times, with an attorney present for five. Id. at 444. Further, before DCPP filed the guardianship complaint, the court entered eight orders and neither defendant, nor her attorney challenged any of the orders before the termination of her parental rights. Ibid. Ultimately, the court held that defendant was required to contest whether DCPP had authority to exercise care or custody "at the very least, at or about the time of the filing of the guardianship petition." Id. at 445.

Here, the underlying factual circumstances regarding Tony's care or custody argument are like those in F.M. Tony was represented by counsel

during the termination of parental rights matter but did not raise that DCPP did not have proper care or custody of Kara. Further, while incarcerated, Tony worked with caseworkers from DCPP to arrange visits for his daughter and at no point challenged their authority over her. Therefore, Tony has waited too long to challenge DCPP's care and custody over his daughter and the doctrine of laches also applies to this argument.

IV.

After reviewing the record and applicable caselaw, we reject Tony's contentions that DCPP did not prove each of the four prongs laid out in N.J.S.A. 30:4C-15.1(a). The trial court's finding that terminating Tony's parental rights is in Kara's best interests is amply supported by the record. We add the following comments regarding prongs one and two.

Children have the right to permanency, safety, and stability. C.S., 367 N.J. Super. at 111. Permanency for the child is favored over protracted efforts at reunification. Ibid.; N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012); see also N.J.S.A. 30:4C-11.1 ("the child's health and safety shall be of paramount concern"); In re Guardianship of D.M.H., 161 N.J. 365, 385-86 (1999); K.H.O., 161 N.J. at 357-58.

"The first two prongs, N.J.S.A. 30:4C-15.1(a)(1) and (2), are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting D.M.H., 161 N.J. at 379). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379).

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dept. of Child. & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383). Although courts have determined that drug use alone is not enough to show harm, these issues in the long-term often impact multiple issues affecting a child's well-being. N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221-22 (App. Div. 1996). Moreover, while "incarceration alone . . . is an insufficient basis for terminating parental rights," a parent's incarceration is "probative of whether the parent is incapable of properly caring for . . . the child or has abandoned the child." (omission in

15

original) (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 136 (1993)) R.G., 217 N.J. at 555-56.

Under prong two of N.J.S.A. 30:4C-15.1(a)(1), the Division must prove by clear and convincing evidence that "the parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." The court may also consider "parental dereliction and irresponsibility, such as the parent's . . . inability to provide a stable and protective home or support for the child." L.J.D., 428 N.J. Super at 483 (quoting K.H.O., 161 N.J. at 353). This inquiry is meant to evaluate if the parent has overcome the initial harm that has endangered the child and if the parent would be able to continue to parent without exposing the child to additional and recurring harm. R.G., 217 N.J. at 557.

The record supports the court's determination that the parental relationship would endanger Kara because of Tony's history of substance abuse and incarceration. Tony has not been able to safely provide for Kara. Although he has completed substance abuse treatment while incarcerated, it has yet to be seen if he can carry that over to a setting where he is not restricted. Moreover, Dr. Wells testified that following Tony's release he would need at least a year to

16

prove he could remain sober, secure housing, and be gainfully employed before he could even be considered to safely provide for Kara.

Tony also argues that the court improperly considered the harm to Kara if she were to be removed from Natalie and Rachel. While the court noted such harm under prong two, such an error was harmless. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ."). The court's findings as to the second prong did not hinge on the harm from Kara's removal, but Tony's overwhelming unfitness. In its decision, the court relied on Dr. Wells's testimony that Tony could not provide a safe home and family life now and in the foreseeable future and that delaying permanent placement would further harm Kara.

Finally, to the extent we have not otherwise addressed any of Tony's remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

17                                                              A-3062-23